The State v. Williams.

THE STATE v. WILLIAMS.

1. **Criminal Procedure:** CHANGE OF VENUE: DISCRETION OF COURT. The granting of a change of venue in a criminal case, on the alleged ground of excitement and prejudice in the county, rests in the sound discretion of the trial court, and an order refusing such change will not be disturbed unless an abuse of discretion is affirmatively shown.

2. ———: OPENING STATEMENT TO JURY: ABUSE OF PRIVILEGE BY DISTRICT ATTORNEY: FACTS CONSTITUTING. In this case, where the district attorney, in his opening statement to the jury, presented a full and minute statement of the facts which (he alleged) he expected to prove upon the trial, many of which, however, he failed to prove, and then proceeded, against defendant's repeated but unavailing objections, to argue the case fully upon such assumed facts, *held* that such misconduct was highly prejudicial to defendant, and that the prejudice was not waived by defendant's replying to such argument; and that a verdict of guilty, returned under such circumstances, and judgment thereon, could not be sustained.

*Appeal from Warren District Court.*

THURSDAY, MARCH 20.

THE defendant was charged by indictment with murder in the second degree, in killing one L. K. Phillips. He was tried, convicted, and sentenced to the penitentiary for thirteen years, and he appeals.

*Phillips & Day*, and *A. C. Bishop*, for appellant.

*Smith McPherson, Attorney-general*, for the State.

ROTHROCK, CH. J.—I. The defendent was indicted jointly with A. J. Earl, J. B. Frazier, J. B. Anderson, B. Daughtery and Seely Smith. The indictment was presented and filed in August, 1881. At the January term, 1882, of said court, J. B. Frazier and A. J. Earl were tried, found guilty, and sentenced to the penitentiary. The defendant was tried separately at the August term, 1882.

Before entering upon the trial, the defendant presented to the court a petition for a change of venue, based upon the alleged excitement and prejudice of the inhabitants of Warren county against him; and the application was overruled and exceptions taken. The petition was supported by the affidavits of a number of persons, and there were counter-affidavits of a very large number of persons filed by the state. All of the affidavits of defendant were in general terms. No facts were set out therein, showing that there was a state of excitement and prejudice against the defendant in the county. The affidavits on the part of the state were in general terms. Now, while it may not be necessary to set out in the affidavits specially the prejudice and excitement relied upon for a change of venue, in order to authorize the court to grant the application, yet, where the showing made is general, and is resisted by affidavits upon the part of the state, this court will be

1. CRIMINAL procdure: change of venue: discretion of court.

slow to interfere with an order denying the change. The record must show affirmatively that there was an abuse of the discretion reposed in the court in determining the matter. We cannot say that the application was erroneously overruled. As the state becomes more populous, and the persons qualified to serve as jurors in most of the counties are now so numerous as to count up into thousands, the reasons which existed for changes of venue when the state was sparsely settled have mostly passed away, and the instances are now rare where an impartial jury may not be obtained in any case in any county. It is the source of much unnecessary court expense, and, when invoked for the purpose of delay, as it often is, it makes an opportunity for most willful and corrupt perjury.

We make these observations without any application to the change of venue in this case.

II. L. H. Phillips was a married man, and, with his wife and five children, the oldest being twelve years of age, resided in Warren county. All of the parties who were indicted for his murder were his neighbors. The homes of defendants, Williams and Anderson, were near to that of Phillips, so that the different members of their families were frequently at each other's homes in a neighborly sort of way.

In the fall of 1880, Phillips was arrested and bound over to answer to a charge of stealing wheat. He gave bond for his appearance to answer the accusation, and the defendant, Williams, as his friend, signed the bond as surety. The grand jury ignored the charge. In March, 1881, he was again arrested upon the same charge, and the value of the wheat alleged to have been stolen was fixed at an amount so that the jurisdiction of the offense was by law conferred upon a justice of the peace. There was a trial before the justice and a jury, and the jury failed to agree. Another trial was had before the justice. The defendant, Williams, was a witness in this prosecution. He was summoned by the state, but it does not appear what his testimony was on the trial. The trial lasted

two days.   He was not at the trial on the first day, but was subpœnead and appeared on the second day.   After giving his testimony, he went home, and the attorney for the prosecution, in his argument to the justice, reflected severely upon Williams, but in what manner does not appear.   Some one went after Williams, and he returned to the place of the trial, and, after the close of the arguments, by permission of the justice, he called the attorney to account for his abuse, and wanted to know the reason for it.   The attorney referred him to Phillips, and thereupon the defendant expressed some feeling against Phillips in a general way.

In a few days after the trial, and on Tuesday, Phillips left his home for Clarke county.   In the evening after he left, his wife told her children that she was going to a creek close by to drown herself, and that she would leave her bonnet on the bank of the creek.   She did not drown herself, but went to some one of the neighbors, but to which one does not appear, and on Thursday evening she was at Anderson's house.   She was claiming that her husband had abused and maltreated her and threatened her life, and that she needed protection from him.   The neighborhood had been excited by the report that she had drowned herself, and search had been made up and down the creek for her body.   A consultation was had with the defendant and others, and late in the evening, after dark, two of the parties went to see the township trustees to have them do something for the protection of the woman.   On the next day the trustees met at Anderson's, and found quite a number of persons there.   The evidence shows pretty clearly that, after the trustees came, Anderson sent for the defendant, Williams.   At all events, Williams came there very soon after the trustees arrived.   There was a general consultation as to what should be done, and the conclusion was reached that the trustees had no authority in the matter, and that the best thing to be done was to have Mrs. Phillips go before a justice of the peace, and have her husband put under bonds to keep the peace.   The defendant took part in this consulta-

The State v. Williams.

tion, by reading and examining the law, and probably, to some extent, by conversation.

The trustees went away, and there was some talk among the persons who remained about getting up a team and taking Mrs. Phillips to a justice of the peace.   In the meantime dinner was prepared, and, the men who were present having finished eating, Mrs. Phillips and the female members of Anderson's family were eating, when some one said, "There comes Phillips."   The house consisted of two rooms, one main room and a shed kitchen.   The table was in the main room.   Phillips passed the end of the house, and the evidence is pretty conclusive that he saw his wife through a window. He went to a back door in the shed kitchen, and, just as he reached there, the defendant and Seely Smith were at the door to prevent his entrance.   Phillips made an attempt to open the door, and the defendant and Smith pressed against it. Phillips succeeded in partly opening the door, so that, as the witnesses describe it, he was about one-half in.   His head and one leg were inside, and one arm was in, and the other holding the door casing.   He seized defendant by the collar with one hand, and, while in this position, two shots were fired into his body, one by Earl and one by Anderson, and the evidence tends to show that another shot was fired by Frazier.   The effect of the wounds was such that Phillips almost instantly died.

When Phillips approached the door, he was told by Anderson that he must not come into the house, and this was repeated to him several times, with the admonition that if he did he would be shot.   Phillips, repeatedly and with oaths, declared that if he was not let into the house he would kill every man, woman, and child in the house.   When Phillips attempted to effect an entrance, or rather when it was known that he was coming, his wife exclaimed, "He will kill me," and she went under a bed.   It does not appear that Williams said anything after it was known that Phillips was coming.   It was claimed by the state upon the trial that defendant, and

the other parties who were indicted with him, formed a conspiracy to take the life of Phillips, and that the effort of William and Smith to keep Phillips out of the house was a mere pretense and a cloak to shield themselves from criminal responsibility for taking his life. It was further claimed that, if there was no conspiracy entered into by the defendants before the time of the tragedy, the taking of the life of Phillips was not excusable on the ground of self-defense, and that the defendant, Williams, although he was silent, and did nothing but try to prevent Phillips from coming into the house, was an aider and abettor of the crime, and equally guilty with those who fired the fatal shots.

We have not set out the evidence which the state claimed established a conspiracy, because we think the case must be disposed of without reference to the question whether a conspiracy was proved or not. We will, however, make some further reference to the evidence, when we come to consider the next question in the case.

III. It is provided in section 4420 of the Code, that at the opening of the trial the district attorney may briefly state 2. ——: opening statement to jury : abuse of privilege by district attorney : facts constituting. the evidence by which he expects to sustain the indictment. After the jury was impaneled, the district attorney commenced to make his opening statement. After he had proceeded for a few minutes, at the request of the defendant the remainder of his statement was taken down in writing. What length of time was consumed in this address the record does not show, but it does show that it was of very great length, and that it was not only a statement of the evidence which it was expected would be introduced, but it was a full and exhaustive argument of the case, and much of it upon a state of facts which does not appear in the evidence. Counsel may be deceived as to some of the evidence which they expect to introduce. They may be deceived by previous statements of witnesses, or may be in error as to what they can prove, or may make state

ments of incompetent evidence, and in such case an error in the opening statement to the jury is excusable.

During the progress of this address, the counsel for the defendant made frequent but unavailing objections. As examples of the unfairness of this statement or address, we will make two quotations therefrom. One of them is in these words:

"When Phillips came to the back door, Seely Smith and Williams kept him out for a moment or two. Crow was in the back room. If they had wanted to, they could have kept Phillips out, but they kept him out until Frazier, Anderson and Smith had got their guns pointed and ready. It did'n't take long. Now they did hold him out for a moment or two, but as soon as the three men I have named got to the middle door, between the back kitchen and the log part, as they got there, they stepped back and let him in, and, as soon as he put his head inside the door, bang went the first gun."

Now, there is not a syllable of evidence to justify this argument. All of the evidence shows that the defendant and Smith resisted the entrance of Phillips through the door to the last. Another extract from this address is as follows:

"Now it seems that Williams' wife sort of set up as a doctor. While Phillips was here (at Indianola) tending court, Williams went to Phillips' house and got a lot of chickens at his house, they being delivered by Mrs. Phillips on account of some sort of medical services rendered to Mrs. Phillips. That is, Williams' wife had been rendering these medical services, and Mrs. Phillips said they should have the chickens, and she would pay them some money besides. He came there in the absence of Phillips and took them away. I need not say what these services were, but they were such that it was known Phillips would object to it if he was at home. Hence the chickens were turned over to Williams in Phillips' absence."

The evidence shows that Mrs. Phillips let Williams have some chickens in the absence of her husband, and that, when

her husband was afterwards advised of the fact he was angry about it. But there is not one word of testimony as to whether or not Mrs. Williams claimed to be a doctor, or whether she rendered any medical services to Mrs. Phillips. Indeed, the evidence does not show upon what consideration the chickens were delivered to Williams, and no inference from anything in the record can justify the insinuation that improper medical services were rendered to Mrs. Phillips.

There are many other statements in this remarkable address, which are wholly without support or justification from the record. We need not say that such a proceeding was unfair to the defendant, and that it was calcluated to prejudice him in the minds of the jury at the very outset of the trial of the cause. Indeed, after a careful reading of the whole record, we were compelled to read it again, to assure ourselves of what was in the evidence as distinguished from the opening statement of the district attorney. The address to the jury was a violation of both the letter and spirit of the statute above cited.

After this address, one of the defendant's counsel made an elaborate reply thereto, in which he sought to answer the same. The attorney-general has caused this reply to be printed in an additional abstract, "as a counter irritant," as he expresses it; and, speaking of the address of the district attorney, he says: "If it be said that it was intended to *and probably did take the place of testimony*, then I say that such was the office intended for the statement of defendant's counsel; and, because the question of veracity thus raised was decided in favor of the district attorney, defendant should not now be allowed to complain."

This is probably as sound an argument as can be made in justification of the course pursued in the opening of the trial in this case. The ready and complete answer to it is, that there is no law authorizing men to be sent to the penitentiary upon the statements of a district attorney, made in opening the case to the jury, and that the defendant waived no right by re-

plying thereto. We are thus met with revisible error at the very threshold of this case. We need go no further.

The judgment of the district is reversed, and the cause remanded for a new trial.

REVERSED.