## STATE OF IOWA v. M. B. FOSTER, Appellant.

**Murder, Evidence Sufficient.** The testimony given is reviewed, its omissions and improbabilities pointed out, and held sufficient, with deductions and inferences fairly to be drawn from it, to sustain a verdict of murder in the first degree.

**Practice: Motion for Change of Venue.** Where the testimony is conflicting as to whether such local prejudice exists as will *prevent a fair trial*, the overruling of a motion to change the venue will not be disturbed.

SAME—FILING IN TIME. It is a sufficient excuse for long delay in filing the motion that defendant did not learn of the prejudice sooner through being confined in the penitentiary, though his counsel reside in the county from which the change is sought.

**Challenge to Juror.** Where the examination, taken as a whole, fairly shows that the juror, in spite of an opinion formed, can decide the case on the evidence, a challenge based on par. 2 of section 4405, Code, is properly overruled.

SAME—WHAT IS PROPER EXAMINATION. A juror may be asked, in view of peremptory challenge, whether he is opposed to the death penalty.

**Practice: Rebutting Evidence of Character.** If defendant shows that his character is good in certain communities, the state may prove that it was bad there and in other communities.

**Instruction: May Define Crime by Words Not Used in Indictment.** An instruction may define murder in the first degree as killing by lying in wait, etc., though the indictment do not charge it to have been so committed.

**Vacation of Judgment of Conviction.** Whether courts, in the absence of statutory authority, have inherent power to vacate such a judgment is not decided, but the showing made is insufficient if that power be conceded.

**New Trial: Newly Discovered Evidence.** While a new trial may be given after judgment, under the statute granting one where there has not been a fair trial, when perjury has been committed and that fact could not reasonably have been ascertained before judgment, the perjured testimony must have been definite, material and likely to have been prejudicial.

*Appeal from Taylor District Court.*—HON. R. C. HENRY, Judge.

FRIDAY, MAY 18, 1894.

ON NOVEMBER 27, 1887, the defendant was charged by indictment with having, on or about the third day of November, A. D. 1887, willfully, feloniously, deliberately and premeditatedly, and of his malice aforethought, killed and murdered Emmett Reed. The defendant was tried, found guilty of murder in the first degree, and the penalty of death fixed by the jury. Judgment was entered on the verdict, and, on defendant's appeal, said judgment was reversed and the case remanded, on the eighth day of May, 1890. 45 N. W. Rep. 385. At the September term, 1890, of the district court, the case was continued; and on December 11, 1890, the defendant filed his petition for a change of venue on account of excitement and prejudice against him in said county, which petition was verified by him on the eleventh day of February, 1890. In support of this petition, defendant filed his affidavit, verified December 11, 1890, together with the affidavit of seven citizens of the county. Affidavits were filed by the state in resistance, and on December 13, 1890, the court overruled said petition for change of venue, to which defendant excepted. On December 13, following, the case was called for trial to a jury, and on the twenty-third the jury returned their verdict as follows: "We, the jury, find the defendant guilty of murder in the first degree, and fix his punishment to be imprisonment in the penitentiary, at hard labor, during his life." The defendant moved to set aside the verdict, and for a new trial, for reasons stated, which motion was overruled, and judgment was entered against him on the verdict, from which judgment he appeals.— *Affirmed.*

*J. R. McCoun* and *Dale & Brown* for appellant.

*John Y. Stone*, Attorney General, and *Thos. A. Cheshire*, for the State.

GIVEN, J.—I. Several exceptions were taken in behalf of the defendant that are not urged in argument. We have examined all of them and find that only those urged in argument required consideration. Counsel presented on behalf of the defendant, with marked ability, all the questions arising upon the record that may be properly urged in his behalf. Appellant's first contention is that the court erred in overruling his petition for a change of venue. It is conceded that, under the statute and decisions of this court, the question of allowing a change of venue was addressed to the sound discretion of the district court, and that this court will not interfere with its decisions unless it appears from the record that that discretion was abused. In addition to the affidavits already mentioned, the defendant showed several articles published in newspapers of the county, of general circulation therein, during the summer and fall of 1890, with reference to this case, and to the conduct of defendant's counsel on the first trial. The state filed, in resistance, affidavits of nine citizens of the county. Several of those who made affidavits, and also three other citizens, were called and examined in open court as to the alleged excitement and prejudice. The evidence on this subject is quite lengthy, covering forty pages of the abstract, and to here set it out, or disclose it, would unnecessarily consume space. It is sufficient to say that, in our opinion, it shows, beyond question, that at and before the first trial there was a prejudice in the minds of some of the people of the county against the defendant; that this prejudice was revived, to some extent, by the reversal of the case, and by the newspaper

articles in evidence.   Appellee contends that the application was properly denied, because not made in time.   It will be observed that the case was remanded on May 8, 1890, was continued at the September term, 1890, and that the application for a change of venue was not filed until December 11, 1890,—two days before the case was called for trial.   Both abstracts show that the petition for a change was verified February 11, 1890.   This must be a mistake, as the case was not then remanded.   We conclude that it was on December 11 that the petition was verified.

It is certainly true that whatever excitement or prejudice existed against the defendant was apparent months before the trial, and could have been known to any one within the county who cared to inquire.   Appellant states, in explanation of the delay in asking the change, that he was confined in the penitentiary at Ft. Madison, and had no opportunity of knowing the feeling against him in the county.   In view of this fact, we can not say that the application should have been denied because of the delay in making it, even if it is true, as contended, that defendant's counsel resided in the county, and knew of whatever prejudice existed.   It was not sufficient that excitement or prejudice existed against the defendant in the county, to entitle him to a change of venue.   It must have been such excitement or prejudice as that, because thereof, he could not receive a fair and impartial trial in that county.   Whether such excitement or prejudice existed was a question for the district court to determine.   While, in our opinion, the evidence leaves no doubt but that there was prejudice in the minds of many persons in that county against the defendant, in relation to this charge, the evidence is conflicting as to whether it was such as that he could not receive a fair and impartial trial therein.   The

district court, with all the evidence before it, decided against the application. While, upon the facts, we might have decided differently, we can not say that the district court improperly exercised or abused its discretion, in determining, upon the evidence, against the defendant's application for a change of venue. See *State v. Read*, 49 Iowa, 85; *State v. Perigo*, 70 Iowa, 657, 28 N. W. Rep. 452.

II. P. Stevens, A. B. Wakeman, and John J. Jared, were separately called, and examined at length touching their qualifications to sit as jurors in this case. The defendant challenged each "for the reason that his conclusions are formed, and he has expressed an opinion, and, taking his whole evidence together, it shows that the opinion he has formed and expressed will prevent him from rendering a true verdict upon the evidence submitted to him on the trial." Each challenge was overruled, and of these rulings the defendant complains. Paragraph 2, section 4405, of the Code, provides, as a ground of challenge for cause, as follows: "Having formed or expressed such an opinion as to the guilt or innocence of the prisoner as would prevent him from rendering a true verdict upon the evidence submitted on the trial." It will be observed that knowledge of the case does not disqualify, nor does the fact of having formed an opinion. It is only such an opinion as would prevent the juror from rendering a true verdict upon the evidence submitted on the trial that disqualifies, or, as it is sometimes designated, an unqualified opinion. It does not appear that any of these jurors had any personal acquaintance with or knowledge of the defendant, or of the facts of this case. All that they knew of either was what they had heard or read concerning the case. Mr. Wakeman heard part of the testimony on the former trial. On the examination, each juror

gave answers which, taken alone, might be construed as indicating an opinion such as would disqualify. The examination discloses the usual misunderstanding on the part of the jurors as to the distinction between a qualified and an unqualified opinion. The matter to be determined was whether any of them had formed or expressed such an opinion as to the guilt or innocence of the defendant as would prevent him from rendering a true verdict upon the evidence, and this was to be determined, not from any isolated answer, but from the entire examination. Taking the whole examination of each juror into consideration, it is apparent that while each had heard what purported to be facts in the case, and had formed and expressed more or less of an opinion thereon, it was not an unqualified opinion. When the questions were plainly put, and understood by the jurors, each answered directly that he had not formed an opinion such as would prevent him from rendering a true verdict on the evidence; and the whole tenor of the examination shows that, notwithstanding what these jurors had heard, and the opinions they had formed, they were each capable to decide the question of defendant's guilt or innocence upon the evidence. We think there was no error in overruling these challenges.

III. On the examination of a juror for cause, the following question was put to him by the county attorney: "Have you any preconceived opinions or notions against capital punishment, when the statute prescribes it, and the evidence is sufficient to warrant it." The defendant objected, whereupon the county attorney claimed the right to so inquire, not as a ground for challenge for cause, but with a view to peremptory challenge. The court withheld decision until peremptory challenges were reached. After the jury had been passed for cause by the state, counsel for

the state renewed the inquiry, to which defendant objected, and the objection was overruled. There was no error in the ruling. The state had a right to make this inquiry, with a view to exercising its peremptory challenges. *State v. Dooley*, 89 Iowa, 584, 57 N. W. Rep. 414.

IV. Defendant having testified in his own behalf, and having examined a number of witnesses as to his general reputation for truth and veracity, and his general moral character, at different places where he had resided, the state, in rebuttal, called a number of witnesses. Defendant objected to the examination of several of these witnesses upon the ground that they were inquired of as to defendant's reputation in certain communities where he had lived, and as to his general moral character while residing in these communities; also that the witnesses had failed to show such knowledge of his reputation and character as entitled them to testify. Defendant himself had introduced evidence of his reputation and character while living in certain communities. It was certainly competent for the state to show, by witnesses having knowledge of the facts, what his reputation was in those and other communities where he had lived. We think each of the witnesses showed himself sufficiently acquainted with the defendant's reputation and character to be admitted to testify on those subjects. Therefore, defendant's objections and motions to strike the evidence were properly overruled.

V. One ground of defendant's motion to set aside the verdict, and for a new trial, was that the verdict is against, and not supported by, the evidence. The evidence is somewhat voluminous, and it is unnecessary that we set out or discuss all the details thereof. The following facts appear without dispute: The deceased was the owner of two spans of mules, a span of gray horses, harnesses, and a wagon on which

his name was marked. During the summer and fall of 1887, he was at work in grading a railroad near Talmage in Union county, and the defendant was keeping a store or saloon and a barber shop at the same place. He became acquainted with the deceased about April, 1887. About the first of October, they left that place together, taking the teams and wagon of deceased, and drove to Hall Station, where they remained at work for nearly a month. From there they drove with the same teams and wagon to Skinner's bridge, on Platt river, in Taylor county, Iowa, where they arrived about 1 or 2 o'clock P. M. on November 2, 1887. They went into camp on the bank of the river, near the bridge, where they were seen by a number of persons of the neighborhood during the afternoon and evening. On the next morning, November 3, about sunrise, defendant left the camp. He was alone, and had with him said horses, mules, harness, and wagon. He traveled by the public road to Bedford, where he fed the teams at a public barn, leaving the wagon standing in the street, and took dinner at a public restaurant. From there he traveled, on the public roads, and in the daytime, to Nebraska City, where he was arrested a few days later with said teams, horses, and wagon in his possession, the name "Emmett Reed" being still marked on the wagon. He also had two hundred and eighty-two dollars in money. While driving across the country, he had two teams hitched to the wagon, using a rope, instead of a fifth chain, in hitching the front span. The defendant made no effort at concealment of himself or property during this journey. On the fifth day of November, 1887, some boys discovered a trunk in the river near where deceased and defendant had camped, which trunk, with its contents, was taken from the river by men whom the boys had called, and was afterward identified by the defendant and others as belonging to the

deceased, and to be the same that he had in the wagon during the trip to the camp. At the same time, a cap with blood on it was picked up near where the camp fire had been, which cap was also identified as the one worn by deceased. A trail was discovered, where something had been drawn on the grass from near the camp fire to the bank of the river, and marks of blood were observed on the grass. On further searching the stream, the men drew out several articles, including some wire, bent as though it had been about a trunk, a surcingle, horseshoe, and a brass car boxing, that belonged to the deceased. On further search, the body of the deceased was raised out of some five or six feet of water. A fifth chain, which was identified as owned by the deceased, and used for attaching the lead span of horses to his wagon, was wound and fastened around the neck, and wounds were found upon the head sufficient to cause death. It is not—and could not, under the evidence, be, successfully—disputed but that some time between the evening of the second and the day of the sixth of November, 1887, Emmett Reed was murdered at that place by blows on the head or by drowning. The defendant testified that about 4 or 5 o'clock on the evening of the second, two men traveling in a spring wagon, came from the south, and stopped at the camp about half an hour, and then went south again, toward Blockton; that while they were there, he purchased Emmett Reed's teams and wagon from him, in their presence, and paid Reed six hundred and forty dollars in money, over three hundred dollars of which was in twenty dollar gold pieces.

He states that about half past 8 or 9 o'clock that same evening these two men returned to the camp, and after remaining about half an hour, started away again; that Emmett Reed took his trunk, and a box that he had reserved in the trade, and went with these men, saying that he wanted to take the train for home.

Defendant states that he had seen one of these men before,—the one who gave his name as Johnson. He denies having assaulted or killed Reed, and says that he did not see him again after he left with the two men. One George Parker, whose deposition was read in behalf of defendant, testified: That he resided in Phillips, Kansas, was a farmer by occupation, and that about November 2, 1887, he was in Taylor county, Iowa. That he had started to hunt work, on the railroad, south of Blockton, and met a man whom he learned was Johnson, and who was going north to Clearfield. That, being told by Johnson that he could not get work down there, he started to ride with Johnson to Clearfield. At about 5 P. M., November 2, they stopped where two men were in camp, two or two and a half miles north of Blockton, near a bridge. That the men had two mule teams and one other team, and other property. That when they arrived at the camp the two men were trading. That he saw one of them give the other some paper money, which, he gathered from the talk, was in payment for the teams and property, and that he afterward learned that one of the men called himself Reed. Parker stated on his examination in chief that: "After the trade I have spoken of, Johnson, Reed, and myself started from the camp to Clearfield, Iowa." On cross-examination, he states that he and Johnson returned to Blockton, and after dark returned to the camp, and then started for Clearfield. It appears that the road from Clearfield to Blockton is a plain, straight road, along the county line, and that Parker had just previously traveled on foot from Clearfield to where he met Johnson, near Blockton, and south of the camp. Parker testified that Johnson and Reed and he started in Johnson's wagon for Clearfield, but got lost, and put up at a farmhouse about midnight, where they remained until 9 o'clock next morning.

He fails to give the name of the farmer, or anything like an accurate description of the place where they stayed. He states that he, Reed, and Johnson remained in Clearfield until 5 o'clock, P. M., when he parted with them on the platform and took the train west for Republican City, Nebraska, and that he met one John D. Adams, with whom he was acquainted, on the train, and with whom he traveled to Nebraska. John D. Adams testified that he met Parker on the train, November 3, at Clearfield, and traveled with him to Nebraska, and that he saw two men on the platform, with Parker, at Clearfield, whom he describes much as Parker describes Reed and Johnson, namely, that Johnson was a small man, and Reed a large man.

It was certainly a very important question for the jury to determine what weight and credit, if any, they would give to the testimony of defendant and Parker, to which we have referred. That question was fairly and properly submitted to it, and there are certainly reasons appearing to render the truthfulness of that evidence questionable. It is somewhat remarkable that Parker, going south, should have been taken up by the stranger, Johnson, and start for Clearfield, from where Parker had just come; and equally remarkable that Johnson and Parker returned from the camp, south, to Blockton, from where they had just come, and again went to the camp in the night. The night was clear, the road was plain and direct, and it had just been traveled by Parker. Therefore, it is remarkable that the three men should get lost on their way to Clearfield, and equally remarkable that Parker should be unable to give any description of the house at which they stayed until 9 o'clock in the morning. Emmett Reed was known to several persons engaged in business on the main street of the village of Clearfield, and some of them would likely have seen him, had he been in the town, as

Parker says, from 10 or 11 in the morning until 5 in the evening. Yet several of these citizens testified that they did not see him. The testimony of Adams does not corroborate Parker, except that he took the train at Clearfield, and that a large and a small man were on the platform with him. Among the reasons that suggest themselves for doubting the testimony of the defendant is the amount of money which he claims to have had and paid, and the difference in his statement and Parker's as to the kind of money paid; he saying that of the six hundred and forty dollars, he paid Reed three hundred dollars in twenty-dollar gold pieces, while Parker saw nothing but paper. Defendant had about two hundred and eighty dollars on his person, when arrested.

He does not claim to have received any money between the second of November and his arrest. He was examined at length touching his resources, and entirely fails to account for how he came to have over nine hundred dollars, as he claims. The fifth chain that was found about the neck of the deceased was just such a chain as defendant needed to attach the lead team to the wagon, and not such a piece of property as Emmett Reed would likely desire to reserve from a sale of the outfit. It is true, defendant claims that a rope had been previously used; that he broke the rope on his way to Nebraska City, and purchased a new one. Even if this is true, it is certainly remarkable that Reed would be carrying such a chain about the country in his trunk, after he had disposed of his teams. Defendant relies much upon the testimony of Firm Newton, called by the state, and who testified that he saw the man leaving camp about sunrise; that he went to the camp fire to see what was burning, remained about a minute, and did not see any cap or clothing around the fire, nor any trail, as though something had

been dragged. Witness states that he smelt something burning, and went to the fire to see what it was; that he found what it was, and went away. It was entirely possible for the cap and trail to have been there, as afterward found, without his noticing them. Mr. Wildman, who passed the camp next morning, does not appear to have been close enough to have seen whether the cap and trail were then there or not. There are other circumstances appearing in the evidence, tending to discredit this testimony, which we will not notice. As already stated, it was for the jury to determine what weight and credit, if any, should be given to this testimony. The question was fairly submitted to it, and we can not say, under all the facts, that it was not warranted in discarding this testimony of the defendant and Parker, and in returning the verdict it did.

VI. The charge is that defendant killed Emmett Reed by blows upon the head with a deadly weapon, inflicting a mortal wound, of which Emmett Reed then and there died. The court instructed the jury that they must find that death was caused substantially in the manner charged. Defendant contends that the evidence shows that death was caused by drowning; therefore, there is a variance between the evidence and the charge. We find no such evidence, but, on the contrary, the evidence of Dr. Singer, who examined the body, shows that death resulted from a wound on the head. The court, in defining the degrees of murder, used the language of the statute. The defendant contends that as there was no evidence that this killing was by laying in wait, or in the perpetration, or attempt to perpetrate, arson, rape, robbery, mayhem, or burglary, it was error to include these in the definition. True, it is not charged that the killing was by lying in wait, or in the perpetration, or attempt

to perpetrate, any of the other crimes named, but there was no error in including them in the definition. Taking all the instructions together, it is entirely clear that the question as to the manner of causing the death, submitted to the jury, was that charged in the indictment. Some criticism is made upon the instruction defining and applying the doctrine of "reasonable doubt." The instructions on this subject are full and explicit, and correctly state the law, as uniformly held by this court.

VII. On the twenty-sixth day of May, 1891, over five months after final judgment had been pronounced and entered, the defendant filed what he entitled "Amendment to Motion for New Trial," wherein he "moves the court to set aside the judgment of the court herein, and the verdict of the jury, in said cause, and for a new trial, for the following reasons." The reasons shown are that the testimony of one Frank Howard, given on the trial of this case, was false, and that Howard has since been convicted of perjury for the giving of said testimony. Defendant's counsel concede that under section 4490 of the Code an application for a new trial "must be made before judgment," and that the provisions of the Code relating to petitions to vacate judgments and for new trials do not apply to criminal cases. The contention is that, though the statute makes no provision for vacating judgments in criminal cases, the power to do so is inherent in the court, and that under this motion, the court should have vacated the judgment, and then granted a new trial. The ground upon which this relief is asked is because of newly discovered evidence, not discovered until after the judgment was entered. Whether the court had power to vacate the judgment, we do not determine, as, in our opinion, the showing was not sufficient to entitle the defendant to a new

trial, even if it had been made before judgment. Newly discovered evidence is not made a ground for granting a new trial in criminal cases, as it is in civil cases, but in criminal cases the court may grant a new trial "when from any other cause [than those previously named] the defendant has not received a fair and impartial trial." We think a new trial might be granted under this provision, when false testimony of a material character had been given in the case, and the proof of its falsity had not, and by diligence could not have, been ascertained until after the trial. On this trial, Frank Howard, called by the state, testified, in substance, as follows: That in the fall, he thought, of 1887, he was traveling with one Johnson; that he thought he had seen the defendant before that time; that he and Johnson met a man with three teams; could not say what kind, nor, positively, that Foster was the man; that Johnson asked the man "where Reed was; I think, positively, that was the name; I think that was the name;" that the man said something, which they did not understand, and they started up, when the man said to Johnson: "If you hear anything drop down there, don't say nothing. I have got the better of him." Howard answered, on cross-examination, that he could not say that defendant was the man. It is shown by affidavit accompanying the motion that Howard was in prison from March 31, 1887, to April 18, 1888, and that Howard stated that he was not in Page county in 1887, but in 1886. Howard himself states that it was not in 1887, but at another time. The importance of Howard's testimony depended upon his identifying the defendant as the man whom he met, and the teams as those belonging to deceased, and that it was soon after the murder that he met him. Howard's testimony was entirely uncertain and indefinite as to each of these points. He answered, directly, that he could not say that defend-

ant was the man, and that he would not like to say positively that Reed was the name used by Johnson. As to the teams, he answered, "I never noticed them at all." As to the time, he states that it was in the fall. "I don't know what time of the month it was, now. I think it was in the year 1887." As already stated, we think the question of defendant's guilt rests upon the credit to be given to his own testimony and that of the witness Parker. The testimony of Howard was so indefinite, as to the points mentioned, that we think it can not be said that, because of it, "the defendant has not received a fair and impartial trial." Therefore, we conclude that there was no error in overruling the amendment to his motion.

We have examined this case, as presented in the record, with care, and fail to find any errors prejudicial to the defendant. We think the defendant had a fair and impartial trial, that the jury was warranted by the evidence in returning the verdict it did, and that the judgment of the district court should be AFFIRMED.