## STATE OF IOWA v. TILMAN P. EDGERTON, Appellant.

**Criminal Law:** CHANGE OF VENUE: *Discretion.* On a motion for a change of venue, because of prejudice caused by newspaper reports of the homicide, and the fact that the family of the deceased was influential, and was scattered over the county, it appeared that, though defendant was removed by the sheriff to another locality, on the death of the boy whom he shot, he was taken back in a few days to the place of the homicide, where he remained until the trial, which occurred over five months after the shooting and that the newspaper reports were in the main temperate, though some of them referred to mobs and lynching. The state secured a large number of affidavits showing that defendant could have a fair trial in that county. *Held,* that a refusal of the motion showed no abuse of discretion.

**Defense to Murder:** IMPROPER SURGERY. A person who inflicts a dangerous wound from which death ensues, cannot defend a charge of murder on the ground that deceased might have recovered had he been treated according to the most approved surgical methods.

**THEFT OF MELONS:** *Evidence.* On the trial of one charged with fatally shooting a boy whom he caught robbing his melon patch, evidence that, previous to the robbery, certain burst melons were found in the highway near the defendant's garden, cannot be received as explaining his presence in the patch at the time of the robbery, armed with a loaded revolver; there being no proof that defendant knew anything about these melons, or that they came from his premises; and stealing his melons would not justify the deadly use of a deadly weapon.

**Instructions Construed Together:** OFFENSES INVOLVED IN MURDER. An instruction defining involuntary manslaughter is not erroneous because it fails to define voluntary manslaughter, if there are other instructions covering the omission.

**Grand Jury Panel:** SELECTION. Under Code, section 236, requiring the county auditor to apportion the number of grand jurors to be selected from each election precinct, "as nearly as practicable in proportion to the number of votes polled therein at the last general election," it will not vitiate the panel that the auditor, finding an even division of the total vote by the right divisor would not yield the number of jurors required, added enough to supply the shortage to several precincts, indiscriminately, it appearing that

no precinct had a less number of names apportioned it than it was entitled to.

EXEMPTION FROM JURY DUTY. The judges of election may return for grand jurors persons over the age of sixty-five years under Code, section 234, requiring them to return seventy-five competent persons liable to serve as jurors, as the provision of section 228, exempting persons over sixty-five years of age from jury service, is personal and may be waived.

Advice of Court to Grand Jury. An indictment is not vitiated because the court gave instructions relating to the law governing the crime charged, to *part* of the grand jurors, in the absence of the others, under a Code provision, that the grand jurors may at reasonable times ask the advice of the court; where all the jurors who so desired, received the instructions.

*Appeal from Warren District Court.*—HON. J. H. APPLEGATE, Judge.

EDNESDAY, DECEMBER 9, 1896.

THE defendant was indicted for murder in the first degree, tried, found guilty of murder in the second degree, and appeals to this court.—*Affirmed.*

*Powell & Ross* for appellant.

*Milton Remley,* attorney general, *H. McNeil,* and *Jesse A. Miller* for the state.

DEEMER, J.—The county auditor, in apportioning the number of grand jurors to be selected at the general election held in the year 1893, selected seventy-five names from the different precincts in the county, giving to each precinct not less than two names, and to some as many as eight. In one township, which cast one hundred and ninety-two votes at the general election in the year 1892, he apportioned three names, and in another, which cast one hundred and eighty-nine votes, he gave four, while in another casting two hundred and forty-seven votes, he apportioned five, and in another, which cast two

hundred and seventy-five votes, he gave four.   This
method of apportionment was made a ground of
challenge to the panel of grand jurors made up from
the list of names so apportioned, and is now com-
plained of on this appeal.  It appears that at the general
election held in the year 1892, four thousand three
hundred and seventy-eight votes were cast.   The
judges of election for the year 1893 were required to
return seventy-five names.  Dividing the total number
of votes cast by seventy-five, and we have fifty-eight
and a fraction as the number to be used in selecting
the grand jurors to be returned from each precinct;
for the statute at that time provided that "the county
auditor shall apportion the number to be selected
from each election precinct, as nearly as practicable
in proportion to the number of votes polled therein at
the last general election."   Code, section 236.   Turn-
ing again to the record, we find that no precinct had
a less number of names apportioned it than should be
given if we use the number fifty-eight as the divisor.
But such an apportionment would not give the exact
number required, and it is evident that the auditor
added enough to the number thus found, to the pre-
cincts indiscriminately, to make the total of seventy-
five.   Now, we have frequently held that a substantial
compliance with the law with reference to appointing,
selecting, and drawing grand jurors is all that is
required.   *State v. Ansaleme*, 15 Iowa, 44; *State v.
Knight*, 19 Iowa, 94;  *State v. Brandt*, 41 Iowa, 593;
*State v. Pierce*, 90 Iowa, 506 (58 N. W. Rep. 891); *State
v. Adams*, 20 Iowa, 486.   The statute we have quoted
does not require an absolutely accurate apportion-
ment.   It says the auditor shall apportion them as
nearly as practicable in proportion to the number of
votes cast in each election precinct.   It would be
impossible to have an accurate apportionment, based
upon the number of votes cast, for reasons which are

perfectly plain; and slight inaccuracies should not vitiate the panel. There was no such departure from the statutory methods in apportioning the grand jurors as to justify the defendant's challenge.

Another ground of challenge was, that a large number of persons returned by the judges of election for grand jurors, were over the age of sixty-five years, and were not, therefore, liable to serve as such. The argument in support of this ground is, that the judges of election were required to select a list of persons competent and liable to serve as jurors, and that a person over the age of sixty-five years is not liable to serve. The provisions of our Code, with reference to this subject, are as follows: Section 234: "* * * Seventy-five persons to serve as grand jurors, * * * and composed of persons competent and liable to serve as jurors, shall annually be made in each county, from which to select jurors. * * *" Section 228: "The following persons are exempt from liability to act as jurors: * * * All persons * * * over sixty-five years of age." Now, we have held that the exemption provided in the last section is a personal privilege, which may be waived, and that it is not a ground of challenge. *State v. Adams*, 20 Iowa, 486. The statute does not make such a person incompetent by reason of his age, and he is liable to serve, unless he claims his privilege, which is wholly personal to him. It follows, therefore, that the persons selected by the judges of election, who were over sixty-five years of age, were both competent and liable to serve as grand jurors, and that there is no foundation for this ground of challenge. The case of *State v. Adams*, is conclusive on this subject.

II. The grand jury which indicted the defendant was called to consider his case specially. After they had deliberated about the matter for some time without concluding as to the degree of crime for which they

should return a bill, some of the members of the panel asked the county attorney if they might consult the judge then presiding. They were informed that they could, and some four or five members went before the judge, and received advice regarding the law of murder. No claim is made that the judge gave any instructions or directions to the jurors who appeared before him, except to explain the law applicable to the case. The complaint, as we understand it, is that the judge was in error in advising a part, and not the whole, of the grand jury; and that he had no right or authority to permit the grand jury to separate, and to advise a part, and not the whole, regarding the law of the case. It appears, however, that all the jurors who wanted any advice regarding the law of the case, went before the court while in session, and there received their information. Our Code provides that "the grand jury may at all reasonable times ask the advice of the * * * court." Code, section 4281. While this law no doubt contemplates that the grand jury, as a whole, should be present when the advice is given, yet we do not think that the procedure in this case was so irregular as to vitiate the indictment. No one contends that the judge did more than correctly expound the law relating to the crime of murder, and no possible prejudice could have resulted from his act.

III. The defendant filed a motion for change of venue, based upon prejudice of the people of Warren county against him, based upon certain newspaper publications of and concerning the shooting, and upon the fact that the family of the deceased was old, influential, respectable, and was scattered over the county of Warren, and had so worked on public sentiment as to cause prejudice against him. It appears from the showing made in support of the motion, that on the day following

the death of the boy whom it is claimed the defend-
ant shot, the sheriff of Warren county, after con-
sulting with the defendant's attorney, and with the
Honorable A. W. Wilkinson, who was then holding
court in Warren county, concluded it was advisable
to remove the defendant to Des Moines, which he
accordingly did. He was kept at Des Moines for a
short time only, and was then returned to Indian-
ola, where he remained until the day of trial, which
was begun on March 15, 1895, more than five months
after the shooting occurred. The newspaper publi-
cations referred to, we cannot set out in full. It is
sufficient to say that, as a whole, they are temperate
in language, and, as a rule, contain nothing of an
inflammatory nature. They are largely unembellished
recitations of the facts as the editors were able to
gather them, and in the comments upon the facts, the
writers generally counseled moderation and respect
for law. True, something is said in some of them of
mobs and lynching and necktie parties, but these
matters were referred to as mere rumors, and were
put in some of the papers with the evident intent of
making the articles sensational. There is no evidence
that there was any talk of mob violence except the
fact that the sheriff removed the prisoner to another
county, and it is evident he soon became convinced
there was no danger, for he returned the prisoner in
a few days. Some of the newspapers complained of
the removal of the defendant from the county because
of the stigma it might cast upon the community. The
state met the defendant's showing by a large number
of counter affidavits, which clearly show, if the facts
recited in them are to be accepted as true, that the
defendant could have a fair trial in Warren county,
uninfluenced by passion or prejudice. The case, in
its facts, is not nearly as strong as appeared to be the
recent case of *State v. Weems*, 96 Iowa, 426 (65 N. W.

Rep. 887), wherein we held that the court correctly overruled the motion to change the place of trial. We have many times held that we will not interfere with the discretion lodged in the district court in such matters, unless it appears that he improperly exercised or abused it. *State v. Weems, supra; State v. Foster*, 91 Iowa, 164 (59 N. W. Rep. 9); *State v. Helm*, 92 Iowa, 540 (61 N. W. Rep. 246); *State v. Williams*, 63 Iowa, 135 (18 N. W. Rep. 682). Such a showing is not made in this case, and we think defendant has no ground of complaint.

IV. Complaint is made of the rulings of the court in excluding certain expert and medical testimony, as well as some medical and surgical books, offered by the defendant, tending to show that by proper treatment of the wounds of the deceased, his life might or could have been saved. The deceased was shot in the lower abdomen, and lived for nearly three weeks after he received his wound. It is not claimed that there was any negligence in the selection of a physician to treat him. But it is contended that if the physician called had resorted to the operation known as "laparotomy," his patient might have recovered, and it is this theory the defendant sought to prove by the evidence which was rejected. In this connection the court gave the following instructions: "You are instructed that if you find from the evidence that the defendant inflicted said wound or wounds upon the person of the said William J. H. Sandy, and that said wound or wounds inflicted by the defendant caused or contributed to the death of the said William J. H. Sandy, then the defendant cannot avoid the consequences of his act in so inflicting said wound or wounds upon the deceased on the grounds that said wounds were not treated according to the best and most approved methods of medical and surgical treatment for wounds of the character so

inflicted by him upon the person of the deceased. If
you find from the evidence that the wounds upon the
person of the said William J. H. Sandy, were in their
nature mortal wounds, and that the said William J.
H. Sandy died from the effects of the said wounds,
and that they were inflicted upon the deceased by the
defendant, then the defendant cannot avoid the con-
sequences of his act in so inflicting said wounds upon
the deceased, on the grounds that by some different
treatment from what said wounds received, the life of
said William J. H. Sandy might have been saved."
This instruction evidently voices the thought of the
court in his rulings upon the evidence, and we think
the principle announced is the correct one. See
*State v. Morphy*, 33 Iowa, 270, and *State v. Smith*, 73
Iowa, 41 (34 N. W. Rep. 597). These cases but
announce a rule of the common law which has passed
unchallenged for years. This rule, as stated by Bige-
low, C. J., in the case of *Com. v. Hackett*, 2 Allen, 136,
is as follows: "The well established rule of the com-
mon law would seem to be that, if the wound was a
dangerous wound,—that is, calculated to endanger, or
destroy, life,—and death ensued therefrom, it is suffi-
cient proof of the offense of murder, or manslaughter;
and that the person who inflicted it is responsible,
though it may appear that the deceased might have
recovered, if he had taken proper care of himself, or
submitted to a surgical operation, or that unskillful
or improper treatment aggravated the wound and con-
tributed to the death, or that death was immediately
caused by a surgical operation rendered necessary by
the condition of the wound." There is no question
but that the wound in this case was a dangerous one.
All the physicians so testified, and all the evidence
shows that death resulted therefrom. It was no
defense, then, for defendant to show that by more
skillful treatment the deceased might have recovered.

Appellant insists, however, that the *Morphy Case,* before cited, is distinguishable for the reason that the instruction approved in that case required that the wound be given in malice. It is true that the latter part of the instruction there quoted does read as stated, but the instruction also says that, if the wound was so given, the defendant would be guilty of murder. The instruction relates not simply to the responsibility of the defendant, but also to the degree of his crime. The first paragraph of the instruction relates to the responsibility of defendant, and is in harmony with the one given by the court in this case, which relates to the responsibility of the defendant for the results of the wound inflicted by him. There was no error in the instruction, or in the rulings upon the evidence.

V. The defendant sought to show by witness Bledsoe that certain burst watermelons were found at a certain bridge in the public highway near defendant's melon patch, four days before the shooting, but the court would not permit him to do so. In order to understand the question here presented, it is necessary to refer to some of the facts disclosed by the evidence. The deceased, who was thirteen years of age at the time he was shot, was engaged with some other boys in robbing the defendant's melon patch, or had entered the same for the purpose of taking some melons. It appears that the defendant was concealed about the premises, and about the time the boys entered the patch he arose, commanded that they throw up their hands, and immediately commenced firing upon them with a revolver with which he was armed. The first shot struck the deceased, and as he turned to run he received another shot in the back. One of the claims made for the defendant is, that these or other boys, had frequently trespassed upon his ground, and stolen melons from

him, and that for that reason he armed himself for the purpose of defending his property. And in support of their claim of error in the ruling on the testimony of Bledsoe they say that his evidence tended to furnish a reason for the defendant's being in the melon patch, armed, at the time the boys went there. There are several answers to this claim. In the first place, there was no evidence to show that these melons, which were found at the bridge, came from defendant's land. In the next place, there is nothing to show that defendant ever saw these burst melons at the bridge, or that he knew anything about them. But, if these matters had been shown, it would be no excuse for the defendant. He would have no right, even under such circumstances, to use a deadly weapon to defend his property from trespass.

VI. The seventeenth instruction is complained of because it is said that it assumes the existence of certain facts which it is claimed were not in evidence. The portion complained of is as follows: "If you find from the evidence beyond a reasonable doubt that the defendant, believing that persons were in his melon patch, or were about to visit it, for the purpose of stealing his melons, started from Liberty Center, armed with a loaded revolver, to go to the place where his melon patch was located, and where the shooting occurred, with a wilful, deliberate, and premeditated intention and formed purpose and design, with malice aforethought, to kill any person who might be found in or who might visit said melon patch for the purpose of stealing his melons, and you further find that William J. H. Sandy was found in said melon patch by the defendant, and that the defendant with such intent, deliberation, premeditation, purpose, design, and malice, shot with said revolver the said William J. H. Sandy, and inflicted upon him a wound or wounds from which he thereafter died, then the

defendant is guilty of murder in the first degree, and you should so return your verdict." It is said that there is no evidence that defendant started from Liberty Center, armed with a loaded revolver, to go to the place where his melon patch was located, with a wilful design, etc. We cannot agree with counsel in this contention. It is true, there is no direct evidence to the point, but there is evidence from which the jury may very well have found these were the facts. It is not our custom to set out the evidence upon which we base our conclusions, and, if it were, it would serve no useful purpose, but would unduly extend this opinion. Our conclusion is that evidence on this point is all that is essential.

VII. In the nineteenth instruction the court correctly defined involuntary manslaughter. It is argued that the instruction is erroneous, because 'it did not also define voluntary manslaughter. This contention would be sound if there were no other instructions covering the claimed omission. An examination of the record discloses the fact, however, that this matter was fully and clearly covered in the ninth, tenth, and thirteenth instructions, to which no exceptions were taken. It is elementary that the instructions must be taken and considered as a whole. It will not do to separate one from another, and say that one does not embody all the law upon a given proposition, and is therefore erroneous. If, as a whole, they fully and clearly and correctly cover the case, this is sufficient. We find no error in the instructions given.

We have not referred to the evidence at length, for the reason that no serious claim is made that it does not support the verdict returned; and there is no necessity now for stating more of it than we have already set out. It is sufficient to say that the verdict finds support in the evidence, and that there is no prejudicial error in the record. The sentence imposed

—twelve years in the penitentiary—was not a harsh one, and while the conduct of the boys in stealing melons was reprehensible, and aggravating to the defendant, yet it afforded him no excuse for the use of the deadly weapon in the manner he did. The judgment of the district court is AFFIRMED.