## THE STATE v. BILLINGS.

77   417
89   114
89   413
77   417
96   435
77   417
d130  481
77   417
f143  583

1. **Criminal Law:** GRAND JUROR: FREEDOM FROM BIAS: EXAMINATION. One of the grand jurors who found an indictment for murder in the first degree against defendant was examined at length as to his freedom from bias, and the material part of his examination is set out in the opinion (which see), from which it appears that he had engaged in some talk of lynching the defendant; but *held* that the examination evidenced a state of mind reasonably free from any prejudice or conviction that should disqualify him, and that the court did not err in allowing him to sit on the case.

2. ——: ——: NUMBER NECESSARY TO INDICT. In a county where, under the present statute, the grand jury consists of five members, and a challenge is sustained as to one, and his place is not filled, the remaining four may, if they all concur, find a valid indictment. (*State v. Shelton*, 64 Iowa, 333, *followed* in principle.)

3. ——: CHANGE OF VENUE: PREJUDICE OF JUDGE: DUTY OF COURT. Where a change of the place of trial of a criminal case is sought on the alleged ground of the prejudice of the presiding judge, the judge is not at liberty to avoid the embarrassments of a trial in the face of such objections by granting a change, but must rule upon the application, when fully advised, "according to the very right of it" (Code, sec. 4374), and his ruling will not be disturbed on appeal unless it is shown that he has abused his discretion; and no such showing is made in this case.

4. ——: ——: PREJUDICE OF PEOPLE: SHOWING AND COUNTER-SHOWING: ABUSE OF DISCRETION. The application for a change of venue in this case, involving a charge of murder in the first degree, was supported by the affidavits of some forty or fifty persons, showing a high state of feeling among the people, and at least some prejudice against defendant, and that there was some talk of lynching him. It also appeared that many other persons applied to to make like affidavits would have done so but for prudential reasons. This showing was opposed by the affidavits of some eight hundred persons, which do not controvert the facts of excitement and prejudice, but do controvert the claim that the excitement and prejudice were so great as to prevent a fair and impartial trial. *Held* (all concurring) that to have granted the change upon the showing made would have been in accord with the general practice in such cases, and (GRANGER, J., *dissenting*) that it was, under all the circumstances, an abuse of discretion for the court to deny the change. (Compare *State v. Read*, 49 Iowa, 85, and *State v. Perigo*, 70 Iowa, 657.)

The State v. Billings.

5. ——— :  INSTRUCTIONS :  CREDIBILITY OF DEFENDANT'S WIFE AS
AFFECTED BY HIS CHARACTER AND MOTIVES.  On the trial of
defendant for the murder of one Kingsley, the court instructed the
jury as follows :  ·"Even though you may believe from the evidence
before you that the defendant has been a man of base and degraded
life, and that he was, from sordid motives of personal gain, press-
ing a false charge against Kingsley, or even that defendant and
his wife had conspired together to extort money from him, or that
the evidence shows that defendant was guilty of other crimes not
charged in this indictment, none of such considerations will war-
rant you in convicting the defendant on this indictment ; nor
must you allow them to have any other consideration than as show-
ing the *animus* or motive of the defendant towards the deceased,
and also as affecting the credit which ought to be given to his tes-
timony and that of his wife, if she participated in any improper
motive toward the deceased."  Defendant's wife was a very
important witness in his behalf.  *Held* that the instruction was
erroneous, because, though it was designed to express the correct
rule of law, and would be readily so understood by the professional
mind, yet its language permitted the jury to consider the acts and
misconduct of the defendant, in regard to which his wife had no
part or connection, as affecting her credibility, on the single con-
dition that "she participated in any improper motive towards the
deceased."

*Appeal from Bremer District Court.*—Hon. G. W.
Ruddick, Judge.

Filed, May 14, 1889.

The defendant was indicted for murder of the first
degree.   Upon the trial of the indictment the defendant
was convicted of murder of the second degree, and from
a judgment on the verdict he appeals.

*W. L. Eaton, C. Wellington* and *E. M. Billings,*
for appellant.

*John Y. Stone,* Attorney General, and *E. A. Dawson,*
for the State.

Granger, J.—I.   At the empaneling of the grand
jury that returned the indictment, one Bockhouse was
examined as to his qualifications, and error
is assigned as to the rulings of the court in
permitting him to remain as a member of the
panel.   The juror is of foreign birth, and it

1. CRIMINAL law:
grand juror:
freedom from
bias: exam-
ination.

is evident he did not at all times fully understand the import of the questions, and in some cases, we think, his answers did not exactly express his purpose. He resided some seventeen or eighteen miles from Waverly, where the homicide occurred, and where the court was sitting. The material part of his examination is as follows: "*Counsel for Defendant. Question.* Mr. Bockhouse, isn't it a fact that you have said frequently, at your own town of Tripoli, that you believed Mr. Billings to be guilty of murder? *Answer.* I have said like this: If he done the shooting, of course he was guilty. *Q.* That is not an answer to my question. *A.* That is the only thing that I remember that I have said. *Q.* Isn't it a fact that you have said, and said frequently, in your own town, you believed Mr. Billings was guilty of murder? *A.* I don't know how to answer that. I don't know that. I couldn't said that he was. *Q.* Haven't you said that you believed he was? *A.* Why, I might have said so on the first, by the saying that some talked. I might have said that. I don't know, though. *Q.* Haven't you said besides, frequently, that in your opinion he ought to be hung? *A.* No; I don't think I have. Don't remember of as I have said that. Don't know as I have said any more than any man that murdered in such a way as that, I thought, ought to be hung. I think that is the way I have said it. Don't think I said that frequently. Never talked with people over there very much in regard to this matter. *Q.* Haven't you said that you would be glad to help hang him? Said it in your own town? *A.* No more than just what I say. If he was the man that shot Mr. Kingsley, that he ought to be hung. I don't know but I would help hang him if I was right there. Some such remark. *Q.* You have said you would help hang him if you were right there? *A.* Yes, sir; if he was in the wrong. *Q.* Haven't you said you believed he was in the wrong, and you would be glad to help hang him, or that in substance? *A.* I never said I would be glad to help hang him. Don't remember that I said I was going to help hang him. Don't think I ever said that.

I won't swear to it; but don't think I ever said that. Don't think there has been much talk over at Tripoli about hanging him. I believe some talk in regard to lynching him. Think I heard such talk. Think I have talked with others. *Court.* In your talk with others there, did you say that you would participate in any attempt to lynch him? Did you say you would do anything of that kind? *A.* No; no, sir; no; I don't think I ever said any such thing. *Court.* Do you mean to say that you have formed no opinion upon the question of guilt or innocence of Mr. Billings on the charge of murder? *A.* I say that I have formed no opinion. *Q.* Do you mean to say that you have expressed no opinion upon that question? *A.* I haven't formed any opinion. *Court.* I ask you about your expression now. Have you expressed any opinion of that character? *A.* You mean whether I expressed my opinion whether he was guilty? *Court.* Yes, sir; guilty or innocent. *A.* I don't know that I have said that he was guilty; not that I remember. *Court.* You don't remember that you have made any such expression? *A.* I don't remember that I made any such expression that he was guilty. *Court.* Is your state of mind such that you could investigate the charge for which he is held here with entire candor and fairness? *A.* Well, it is so I want to hear a good deal more about it than I have before. *Court.* No; but would you investigate it fairly, candidly and impartially? Of, course, it is here for the purpose of investigation. *A.* I mean, before I could pass my opinion, I would want to hear a good deal more than I have. *Court.* I want to know whether or not you can take part in that investigation impartially, for the purpose of determining from the evidence the fact, free from any prejudice that you have had heretofore, if you ever had any. *A.* Yes, sir; free from any prejudice, I could take part.

It is true, the juror had been in the midst of strong excitement, and where there was evidently a conviction as to the guilt of the defendant, as must be the case where there is talk of lynching. One expression of the

juror, as "Think I talked with others," in the connection in which it appears, tends to show that he talked with others of lynching. If satisfied of the fact that he counseled or favored such a proceeding, we should hesitate much before allowing an indictment found by the vote of such a grand juror to stand. From all the testimony of the grand juror, we do not think such is the fact. He was undoubtedly present when there was talk on that subject, and talked himself; but the evidence does not show that he counseled any such step, or favored it. His examination by the court evidences a state of mind reasonably free from any prejudice or conviction that should disqualify him from acting as a grand juror. As to the juror's having formed an opinion that would disqualify him, the action of the court in overruling the challenge has strong support in the case of *State v. Shelton*, 64 Iowa, 333, and we think the holding correct.

II. One Wile, upon examination as to his qualifications as a grand juror, was challenged by the defense, and the challenge sustained, and, under instructions from the court, took no part in the case; but his place on the panel was

2. ——: ——: number necessary to indict.

not supplied, and the failure to supply his place is assigned as error. Under the present law a grand jury for Bremer county is composed of five members, and the concurrence of four is necessary to the finding of an indictment. Hence, as to this case, but four of the five members of the grand jury took part, all of whom must concur to legally present the indictment, and it is urged to us that the defendant was entitled to the presence and deliberations of a full panel. Inasmuch as we regard the question as settled upon authority, our reasoning upon it would be of little, if any, practical utility. Prior to January 1, 1887, a grand jury was composed of fifteen members, and the concurrence of twelve was essential to the validity of an indictment. The same reasoning that would entitle a defendant to a full panel under the law as it now is would have entitled a party under the law as it then was to a full panel; the

line of argument being that it cannot be known what
would have been the effect of the influence and delibera-
tions of the absent members as to those present, and
that with a full panel an indictment might not have
been found.   The argument is not without force, but in
the case of *State v. Shelton, supra,* three of the fifteen
members of the panel were excused from acting in the
case because of challenges, and only *twelve members*
took part, all of whom must concur to present the
indictment.   In that case this court held that the
defendant was not entitled, as a matter of right, to the
full panel in his particular case ; that, the grand jury
being legally empaneled, its organization was not
affected by the absence of the three ; and the indictment
was sustained.   We think that case ample support for
the ruling of the district court in this case.

III.   At the term at which the indictment was
returned the defendant filed his motion to change the

3. ——: change     place of trial, on the ground of the preju-
of venue :
prejudice of     dice of the judge.   The defendant is a
judge : duty
of court.     lawyer of many years' practice in Bremer
county, which is and has been for many years the home
of the presiding judge.   The petition for the change is
quite elaborate, describing with considerable minute-
ness many instances of defendant's experience in cases
before the court, and his treatment by the court.
Without any reference whatever to the merits of these
particular complaints, we think the defendant believed
there was prejudice against him, and that he could not
have an impartial trial unless his application was
granted.   It is, perhaps, unfortunate that any person
should be put on trial for his life or liberty with such a
belief.   This is the most objectionable feature of this
particular branch of the case, for an examination of the
record, both as to this showing for a change and the
trial of the indictment, nowhere impresses us with a
belief, or even a doubt, but that the utmost fairness was
manifested by the court in all departments of the trial
as to the defendant.   Owing to the peculiar provisions
of our statute, the trial judge experiences his most

delicate and embarrassing duty in passing upon the question of his own impartiality or want of prejudice for the trial of causes. The statute, in terms, is a restriction upon his inclinations or promptings to grant the change, and thus avoid comment and the embarrassments that necessarily follow his sitting for the purpose of trial after such objections are interposed. When a petition is filed, averring his prejudice, his duties are prescribed by Code, section 4374, in these words: "The court, in the exercise of a sound legal discretion, must decide the matter of the petition, when fully advised, according to the very right of it." He is not to give judgment as to his preferences, or as to the beliefs of the applicant for the change, but as to the fact of the prejudice as it appears to him. This court has frequently said that it can only interfere in such cases where the trial judge has abused the discretion with which he is invested. *State v. Mewherter*, 46 Iowa, 88; *State v. Ray*, 50 Iowa, 520.

IV. At the time of presenting the petition for a change of venue on account of the prejudice of the judge, a petition was also presented for a change of venue because of prejudice and excitement against the defendant in the county, and the application also asks that the cause be not sent to Butler or Floyd county, because of such excitement and prejudice there. This application is supported by the affidavits of some forty or fifty persons residing in such counties, a large majority of the affiants being residents of Bremer county, and their affidavits have reference only to that county. Some of these affidavits state facts showing the grounds for the belief of the affiants as to such prejudice and excitement, and they unmistakably show a high state of feeling among the people, and at least prejudice to some extent as against the defendant, and the facts undisputed show that in some instances there was talk of lynching the defendant. The affidavits of some who endeavored to get signatures to affidavits for a change of venue show that, of those approached and

who refused to sign, many expressed themselves that there should be a change of place of trial, but that to make the affidavit would prompt the accusation that they were taking sides with Billings, or it would hurt them in their business. Other and particular facts are disclosed by the affidavits for the change, which need not be stated, further than that they show an intensely strong feeling against the defendant in and for miles about Waverly. This feeling was augmented by reports, and to some extent a belief, that in many respects the defendant was a dangerous and bad man. Opposed to this showing for a change of venue are the affidavits of some eight hundred residents of the three counties named, most of them, however, being residents of Bremer county. The affiants reside in the different townships in the county, and represent nearly all the business interests, and among them a large number of farmers residing outside of the villages. The substance of these affidavits is that the affiants are well acquainted with the general feeling and sentiment of the people of the county towards the defendant, and that they know of no prejudice or excitement that would prevent the defendant from having a fair and impartial trial in the county. These affidavits do not controvert the particular facts stated in the affidavits for the change, nor do they deny the facts of excitement and prejudice; but they do controvert the claim that the excitement and prejudice is so great as to prevent a fair and impartial trial. On the trial before us this point was urged by appellant with much apparent confidence, and the members of this court are agreed that the granting of the change, under the showing made, would have been in accord with the general practice in such cases, and saved from the record of the case at least the question of doubt, if the defendant had been accorded a trial under such circumstances that the verdict was not influenced by the excitement or prejudice surrounding it. While agreed as to this fact, there is not a unanimous conviction that the refusal of the court was an abuse of its discretion. A majority of the members think the

facts of this case distinguish it from other cases wherein
this court has held that the refusal of the district court
to grant the change was not an abuse of discretion, and
they believe and hold that it was error to refuse the
change, under the showing herein made.    The writer of
the opinion does not concur in this view, and believes
that the action of the district court does not involve an
abuse of discretion, if we are to be guided by the former
holdings of this court.    In the opinion of the writer, the
case of *State v. Read*, 49 Iowa, 85, presents a state of
facts equally as strong, if not stronger, against the
action of the district court than this, and its action was
sustained on the ground that it had not abused its dis-
cretion.    That case has strong support in the case of
*State v. Perigo*, 70 Iowa, 657, and, in my judgment,
those cases should control our action on this question.

V.    Error is assigned to the giving of the nineteenth
instruction by the court, in these words: "The jury
must not be drawn away from the proper
consideration of the charge in the indict-
ment.    The defendant is not charged in this
indictment with presenting to Kingsley an
infamous and false charge of seducing his
wife, for the purpose of extorting money, but the
charge is that he fired the shot that caused the death of
Kingsley; and, even though you may believe from the
evidence before you that the defendant has been a man
of base and degraded life, and that he was, from sordid
motives of personal gain, pressing a false charge against
Kingsley, or even that defendant and his wife had con-
spired together to extort money from him, or that the
evidence shows that the defendant was guilty of other
crimes not charged in this indictment, none of such
considerations will warrant you in convicting the
defendant of the charge in this indictment.    Nor must
you allow them to have any other consideration than as
showing the *animus* or motive of the defendant towards
the deceased, and also as affecting the credit which
ought to be given to his testimony and that of his wife,
if she participated in any improper motive towards the

5. ——: instruc-
tions: credi-
bility of de-
fendant's wife
as affected by
his character
and motives.

deceased. Nor have you anything to do or consider with reference to what has been said about public opinion on this case, and you must give it no consideration, but confine your investigations to the charge presented by this indictment, namely: 'Did the defendant fire the shot which caused the death of Willis S. Kingsley.' To the solution of this question under the evidence before you in this case you must bring your cool, deliberate and dispassionate judgment, uninfluenced by other consideration than the evidence before you, and the law as given to you in the charge." Mrs. Billings was a very important witness for the defendant, and the criticism upon the instruction is that if the jury should find that Mrs. Billings had participated in any improper motive toward Kingsley (the man alleged to have been murdered), then the jury might consider the character and conduct of Mr. Billings, as to his having committed other crimes, or having been a man of base and degraded character, etc., as affecting her credibility as a witness. In argument to us it is not questioned but that, if such is the proper construction to be given the instruction, it is erroneous, and to the extent of being prejudicial, and should reverse the judgment. The only point urged is that it should receive a different construction, and the claim in that respect is that, properly understood, the instruction means that only the conduct of Mrs. Billings could be considered as affecting her credibility. We can readily understand that such was the purpose of the learned judge who wrote the instruction, because, thus understood, it is in harmony with a familiar rule of law; but such an understanding does not come from the language used. It is not for us to give to the language that construction which the professional mind may assume the court intended, but we must give it that meaning which the language used would reasonably convey to the jury, for it is its guide to the law of the case. It was evidently the design of the instruction, as a whole, to guard the jury against any considerations which might prejudice the rights of the defendant. The

part of the instruction relative to the credibility of the defendant and his wife is in the nature of an exception to the restrictions urged upon the deliberations of the jury; and hence it has especial prominence in the instruction. It could not be questioned that all the acts of misconduct referred to in the instruction, and the base and degraded life of the defendant, as believed by the jury, could, under the instruction, be considered as affecting the credibility of the defendant, and the language is identically the same as to the credibility of the wife, if she participated in any improper motive towards the deceased. The instruction says: "None of such considerations will warrant you in convicting the defendant of the charge in this indictment, nor must you allow them to have any other consideration than as showing the *animus* or motive of the defendant towards the deceased, and also as affecting the credit which ought to be given to his testimony and that of his wife, if she participated in any improper motive towards the deceased." No reasonable transposition of the terms employed aids appellee's claims for construction. The pronoun "them" refers for its antecedent term to the word "considerations," being plural in form, and but a single instance of misconduct of the wife is referred to in the instruction. With the fact established that the wife had participated in an improper motive towards the deceased, the instruction allowed the jury to consider the acts and misconduct of the defendant, in regard to which she had no part or connection, as affecting her credibility. There is no claim that such is the law, nor could there well be, and the error is certainly prejudicial to the defendant. On account of the errors in giving the instruction and refusing to grant the application for change of place of trial from Bremer county, the judgment is

REVERSED.