## STATE OF IOWA v. GEORGE WEEMS, Appellant.

**Practice: CHANGE OF VENUE.** Defendant's affidavit alleged that inflammatory newspaper articles had made it necessary to move him out of the county to save him from a mob and that his life would be in danger during trial in such county. Copies of newspapers were attached which narrated the mob's conduct. There was no evidence that the matters narrated actually occurred. Nineteen citizens swore that they believed that defendant could not obtain a fair trial because of excitement caused by the newspapers, but none of them say that they know anything of the feeling of the people or that they are to any extent acquainted with such feeling. In opposition the sheriff swore that, a few days after removal he returned defendant and that the only indication of violence was a crowd of people attracted by curiosity. Two hundred and ninety-five citizens made affidavit that they knew the sentiment of the inhabitants of the county in the premises and that defendant could have a fair trial. He was in the county three weeks before the motion was heard and no violence was offered then or during the trial. *Held*, the denial of the motion to change cannot be interfered with.

**CONTINUANCE.** As one charged with a capital crime is not as a matter of law entitled to time beyond the first term after indictment to prepare for trial, there will not be a reversal because a continuance beyond that term was denied where it does not appear that defendant was unable in the first term to get any evidence he needed, or that he was prejudiced by want of preparation.

**CROSS-EXAMINATION.** The exclusion of questions asked a witness on cross-examination as to her character and that of the house in which she lived is not reversible error, where the only facts as to which her testimony relates are undisputed.

*Same.* On cross-examination of one indicted with defendant it is proper to exclude a question whether witness' attorney did not tell him that he had better testify to enough to let him out of it and it would go easy with him, and whether he did not have the idea that it would benefit him to tell that stuff.

DISCRETION. It is within the discretion of the trial court to say whether a defendant accused of murder shall be allowed to have a codefendant, who is to be separately tried, present, ready for consultation instead of calling him if needed.

EVIDENCE. The fact that the state failed to identify a revolver as being the one with which a murder was done, does not make the admission of evidence received in the attempt, reversible error.

*Same.* One witness claimed that defendant told him in the presence of S., "If a railroad kills anybody, nothing is thought of it, *but because we got the best of a railroad man they* want to drive us off the face of the earth." S. was called to contradict this witness. *Held,* he cannot be asked whether defendant stated "The railroad company can kill a man and nothing is said about it, *but now we got the best of the railroad men, they want to drive us off the face of the earth or something like that.".* The fact that accused did not make the last statement would not contradict that he made the first and, besides, the addition of "or something like that" to the question, made it too vague.

*Same.* The exclusion of a question asked for the purpose of contradiction is not reversible error, where there is no such fact in evidence to be contradicted, and is discretionary.

JUROR: PREJUDICE. A conviction will not be disturbed because a juror had formed the opinion that deceased was murdered, when that fact is practically conceded and the juror says that he knows of no reason why he cannot give a verdict in accord with the evidence. Code, 4405.

PLEA AND PROOF. Where the verdict charges that murder was committed with deliberation, premeditation and malice aforethought, evidence that the killing was done in an attempt to rob is admissible as showing deliberation, premeditation and malice aforethought, though the indictment does not aver that the homicide was committed in an attempt to rob.

PRESENCE OF CODEFENDANT. One jointly indicted took the stand as a witness for his codefendant and was withdrawn by his counsel for consultation, with the co-operation of defendant's attorney. The result was, that when he again took the stand, he declined to answer further questions because it would tend to criminate him. *Held,* the fact that the court refused to let defendant and his counsel take part in said consultation did not constitute error.

REFERENCE TO FAILURE TO TESTIFY. It is not error to charge the jury that it is not to consider defendant's failure to testify against him. Code, 3636, prohibits counsel for the state, only, from referring to such failure to testify.

**Practice in Supreme Court:** OBJECTION BELOW. Facts stated under which an appellate court will not interfere because the objection

that answers would criminate a witness were made by the attorney of the witness instead of the witness.

PREJUDICE. An appellate court cannot say that a remark of the trial court in refusing to allow a codefendant in a prosecution for murder to be present for consultation, that upon a previous day a bottle of liquor was found upon such codefendant's person, is prejudicial error.

PRESUMPTIONS. Where all the reasons for excluding, one jointly indicted from the court room are not in the record this court will not presume that the reasons not appearing were insufficient to warrant the exclusion.

Instruction. An instruction that if two or more persons conspire to commit *an unlawful act,* and in pursuance of such conspiracy and such unlawful act they, or either of them, take the life of or kill a human being, it is murder, if inaccurate in the use of the words "an unlawful act," is not erroneous, where a further instruction separated only by a semi-colon makes it clear that the unlawful act referred to is robbery, and only permits a conviction in case the murder was committed in an attempt to rob.

SAME. Correct instructions are properly refused where the rules embraced therein have already been given, although not in the same or similar language.

*Appeal from Polk District Court.*—HON. S. F. BALLIET, Judge.

FRIDAY, DECEMBER 13, 1895.

Indictment for murder. There was a verdict of guilty; and a judgment imposing the death penalty. The defendant appealed.—*Affirmed.*

*W. H. McHenry* for appellant.

*Milton Remley,* attorney general, *Jesse A. Miller,* and *J. J. Davis* for the state.

Granger, J.—I. On the nineteenth day of May, 1894, one L. B. Ridpath, a passenger conductor while on his way from his home to his train, in the city of Des Moines, was shot and killed. This defendant, John Hamil, and John Kraut, were on the first day of

June, 1894, jointly indicted for the murder, the offense being charged in the first degree. The cause was as to the defendant Weems called for trial July 9, 1894, resulting in a verdict of guilty of the crime as charged, and the jury recommended the death penalty.

A few facts may appropriately be stated in this connection. On the night that Ridpath was killed, the three defendants, as indicted, were together from about 6 or 7 o'clock in the evening until the killing took place, which was on Third street, near Center. They met on the east side of the river, at a house, and afterwards went to the west side and visited two or three places together, when they went north on Fourth street to Center street. From the testimony of Kraut, who was a witness for the state, it is made to appear that while on Fourth street, and near Center, Weems said he had to have some money before morning, and said that he must have a suit of clothes in a certain length of time. While on Fourth street, either Weems or Hamil made the remark that he "was going to hold up the first plug that came along." On Center street they all went east to Third street, and saw one man pass. Weems and Hamil talked of "holding him up," but it was said: "Them kind of people haven't got no money." Soon after Ridpath came along, and Weems and Hamil crossed the street, and met him, and soon Kraut heard a pistol shot, and looking, saw Weems and Hamil run away, and he crossed over and saw that Ridpath was killed. Later in the evening, Kraut saw Weems and Hamil at Mrs. Whitcomb's, on the east side of the river, and Hamil inquired if the man was hurt, and he was told by Kraut that he was dead. On the twenty-second day of May, 1894, three days after the killing, Weems made a confession, which is in the abstract; and in most of the particulars, to the time the three men reached Third street, it corroborates Kraut substantially. This statement is so

important that we give the part of it referring to what was done after reaching Center street. It is as follows: "Just as we got to Center street we saw a young fellow going east on the north side of Center street. Barney said: 'Shall I stick him up?' I said: 'No; he has got nothing. He is nothing but a kid.' Hamil said: 'I have a notion to hold him up anyhow. Those are the kind of people that generally have money.' We then started east on Center street to Third street, and started south on the west side of Third street, when we saw a man going south on the east side of Third street, carrying a satchel. He was about sixty feet north of us. Hamil and myself started diagonally across the street ahead of him, to hold him up, and Kraut was to stay on the west side of the street and come over and help us if he was needed. We got on the sidewalk about fifty feet south of the man that was shot. We walked down the street ahead of him until we came to a large tree by the side of the walk. Just before we got to the tree, we met a man and woman going north. Hamil was standing behind the tree; I, on the edge of the sidewalk. Just as the man came up to us Hamil pulled the revolver out of his pocket, and said, 'Hold up your hands.' The man threw up his grip, and hit the revolver. As he hit it, it discharged it. Then Hamil grabbed the grip, and started to run. We both ran across the street and into a blind alley. Hamil cut the grip open. He got one large and one small leather pocket book, and an ivory handled revolver, out of the grip."

With this partial history of the case we may better present some of the questions to be considered.

II. On the twentieth day of June, 1894, the defendants in the indictment, Weems and Hamil, made their application to change the place of trial, because *first*, the minds of the people of the county had been

poisoned and prejudiced against them by the publication, in all the daily newspaper published in the city of Des Moines, of "inflammatory and highly-colored, display-headed, doubled-headed accounts of what purported to be detailed recitations of the facts of the alleged crime, and connecting defendants with the same," which accounts are attached to the application as exhibits; *second*, because the excitement had reached such a state that violence was threatened, and even attempted, against them, and the officers of the law were compelled to remove them, to protect their lives; *third*, because the person killed was a railway conductor, and popular with all classes of railroad men, and the minds of such were especially appealed to and poisoned and prejudiced against the defendants; and *fourth*, because the lives of the defendants will be in danger of mob violence while on trial in the county. The application, besides being sworn to by Weems and Hamil, is supported by the affidavits of three parties, to conform to the law in such matters. There is also an affidavit signed by nineteen others, residents and citizens of Polk county, in which they say that they "believe that the said defendants cannot obtain a fair and impartial trial in said county, because of the public excitement against the defendants, because of the many inflammatory newspaper articles published in all the papers of said county, concerning the alleged crime of said defendants." The showing for a change is resisted by an affidavit of J. D. McGarrah, sheriff of said county, to the effect that he was absent from the county when said defendants were arrested; that some of his deputies, as a matter of overcaution, removed the defendants from Polk county on Saturday evening; that he returned on Monday after, and upon investigation to know if it was necessary for them to be kept out of the county, because of passion or feeling of the

people of the county, he became satisfied that there was no such feeling or passion; and that on Tuesday he brought them back into the county. He also states that he became satisfied that there was never any danger of mob violence, and that the crowd of people, men, women, and children, that assembled upon learning of the arrest, was composed of curiosity seekers, who were interested in the arrest of persons charged with crime. There were also affidavits signed by two hundred and ninety-five inhabitants of Polk county, who say, each for himself, that he is acquainted with the people of said county, and knows their sentiments and feelings in relation to the case, against Hamil and Weems; that there are one hundred thousand inhabitants in the county; that only a small portion of the people of the county have given any attention to the facts of the case, or have particular knowledge of the case; that most of the people of the county are not only without prejudice, but have no knowledge whatever in relation to the case; and that defendants can have as fair a trial in Polk county as in any other county in the state. The court denied the application, and complaint is made of the ruling.

It will be well to here state that what is represented of the publications as to their being "highly-colored, display-headed accounts" of the affair is true. These exhibits cover about thirty pages of typewritten matter. Some instances of the headings are: "Murderers in Jail;" "John Kraut and John Hamil are under Arrest;" "Former has Confessed;" "It was a Robbery;" "Hamil is caught;" "All are Captured;" "The Murderers of Conductor Ridpath Languish in Jail;" "Safe from the Mad Mob;" "All in the Toils of the Law before 48 Hours;" "Hamil and Kraut were Run Off to Newton, Iowa;" "From Whence They Were Returned to the City To-day;" "Are Again in Jail;" "Sheriffs Guard the Jail;" and others of like tenor.

The articles purporting to give the facts are much what the headings would indicate. As to the facts of violence if the cause should be tried in Polk county, nothing more need be said than that the defendant Weems was tried in the county without any such a result, or attempt at it. The application for the change was filed about the middle of June, and Weems, Hamil, and Kraut had been back in the county for some three weeks, and there is not a word in the showing for a change to prove that any person or persons had in any way contemplated violence though the fact of their return had been announced through the papers by prominent headings. In a legal sense, the same conclusion may be stated as to violence either attempted or threatened before the removal from the county jail. It is true that papers contained statements that a large concourse of people,—a mob,—to the number of three thousand or more, assembled about the jail; that there were murmurs of lynching; that only a leader was needed to put threats of lynching into execution and many like statements. These exhibits do not prove the facts as stated in them, nor tend to prove them. They are not evidence of such facts in any sense; nor are they used as such. The facts recited are unverified by the oath of any person. The exhibits are attached to the application, not to prove the facts recited in them, but to show what was put before the people, as indicating the effect upon their minds as to exciting them to violence or creating prejudice. Take these exhibits from the application, and there is not a word from any one, barring, perhaps, the statements of Weems and Hamil, by construction, that can be construed as meaning that there was danger of violence. The same considerations apply materially, as to the question of the prejudice of the people, so that a fair trial could not be

had in the county. In this respect it was proper for the court to consider the probable effect of such articles on the minds of the people. The showing of appellant is peculiar and unusual. Not an affiant states that he knows anything of the feelings of the people, or that he is acquainted to any extent with them. Nor are facts stated from which it can be understood that they have such knowledge. It is a bare statement that they are residents of the county, and believe that the defendants cannot have a fair trial, because of the excitement and prejudice caused by the articles published. It leaves on the mind little more, if any, than an impression that their conclusions are based on their judgment of what would be the effect of such publications. The showing on the other side is materially different. Each of the two hundred and ninety-six persons stated his means of knowledge, and his conclusions are based thereon. The weight of truth, by comparison, is overwhelmingly against the fact of prejudice. Of course, this statement is made on the theory that we do not take as established the recitals in the newspaper articles. They are not, as we have stated, to be considered as facts.

There is a claim that, while the people were assembled, the judges of the district court met in full sight and hearing of the mob, and consulted; the consultation resulting in the prisoners being removed to Jasper county. The only proof of such a consultation is a statement in one of the articles published, as follows: "Judges Conrad, Balliett, and Spurrier, and Deputy Sheriffs Mattern and Compton, held a conference at about six o'clock, the result of which was not made public; but it is supposed the court instructed the officers as to the best mode of procedure, and to what extent they could go in case of a raid made on the jail." If we could accept this as a proven fact, it is

plainly to be seen how different the facts are as to the
conference from what is claimed. It does not appear
where it was held, or that the removal was the result
of it. The most that could be said of the conference
is that because of an assemblage of people, whose
purposes were unknown, a precautionary conference
was held. Again, as to these articles, if they could be
considered on questions of fact, they are so conflicting
as to be absolutely unreliable. Notwithstanding the
repeated statements as to the purposes of the mob, and
that only a leader was necessary to have brought on a
lynching, it is said: "At six o'clock last night a mob
commenced gathering around the courthouse square,
and at seven o'clock there were at least three thou-
sand people present. It was an orderly mob, many
ladies being present, and all drawn from curiosity."
In quite close connection with this statement it is
said: "About ten o'clock a wild-eyed agitator made a
speech from the courthouse steps, and offered to lead
the mob. He not only wanted to hang Kraut and
Hamil, but Mrs. Michael Smith as well." No attention
seems to have been paid to it. The men, when removed
to Jasper county, were, by three deputies, led through
the assembled crowd to the train, without an attempt
at violence. The known facts and results are in plain
contradiction of the facts, as to the real purposes of
the people assembled, as expressed in the articles.
This case, as to the facts, when confined to legal
proofs, is unlike any other case considered by this
court. The showing is widely different from that in
*State v. Billings*, 77 Iowa, 417 (42 N. W. Rep. 456);
*State v. Canada*, 48 Iowa, 448, or *State v. Nash*,
47 Iowa, 347, to which reference is made. In
those cases it will be seen that the affidavits in
support of a change are of a different character. From
those cases it will be seen that the district court in

such matters possesses a large discretion, to be inter-
fered with only in cases of abuse; and, applying the
rule, there is no ground for disturbing the action of
the district court in refusing the change.

III. On the ninth day of July, a motion for a
continuance to the September term was filed and over-
ruled. The grounds of the motion are that sufficient
time had not elapsed for the public feeling and preju-
dice, as shown by the motion, to change the venue, to
subside; that public justice does not require the trial
of a person charged with a capital offense so soon as
the first term after the commission of the alleged
crime; that there had not been time to prepare for the
trial; and that the defendant was without means, his
attorney being appointed for his defense. The
motion is unsupported in any way aside from its
reference to the showing in the motion to change
the venue, and what we may notice from the record.
What has been said as to the showing of prejudice and
excitement will suffice for that branch of this motion,
for the proofs are the same. As to the other grounds
of the motion, it may be said that there is no rule of
law granting to a defendant, charged with a capital
offense, time beyond the first term to prepare for trial.
There was no showing of particular evidence needed
that could not be had. Nor does it appear from the
fact of the trial being had that there was prejudice
because of a want of preparation. There was no error
in the ruling.

IV. At the impaneling of the trial jury, in
answer to questions showing the competency to serve,
some eight jurors so answered that their right to sit
was challenged, and the challenge overruled. We

need not set out the record as to all, but will set out questions to two of them, and the answers. Mr. Stewart said: "I do not recollect any of the particulars that I ever heard about this transaction. I think my mind is free from bias." Question by Haskins, for defense: "You have formed the opinion, unqualifiedly, that Conductor Ridpath was murdered?" Answer: "Yes, sir." By the state: "Did you form an unqualified opinion that some one had been murdered or some one had been killed?" Answer: "I thought some one had been murdered." Later, in answer to a question by the state, he said: "I think I can give the defendant a fair and impartial trial, under the law and the evidence." Mr. Hatcher answered the same questions in the same way. At this point in the examination (others of the eight being also being interrogated with much the same answers), the jurors were challenged, as having formed an unqualified opinion on a branch of the case. The court then said: "Gentlemen of the jury, do either of you know any reason why you could not sit in the trial of this case, and render a verdict according to the law and the evidence as it shall be given to you on trial? Do you know any reason why you could not thus sit as jurors in the trial of this case? If so, manifest it by raising your hands." No hands raised. The Court: "Your silence is taken as an answer in the negative." Challenge denied. Mr. Hatcher further said in answer to a question by defendant: "I formed the opinion that he had been killed, and was killed wrongfully, by some one that had no right to kill him." Mr. Stewart was then asked: "That is the same with you? You formed the opinion that he had been killed and murdered?" Answer: "Yes." As to the others the further examination was somewhat similar, and the challenge denied. The point is made in argument that the

defendant was entitled to jurors who were not prejudiced against him on any material fact in the case.
There is a practical concession in argument, and it is
a fact, that the matters as to which opinions were
previously formed were not in dispute on the trial;
that is, there was no conflict. They became practically
undisputed facts. This is important as to the fact of
actual prejudice from the ruling. It is, however, said
that this could not be known when the jury was
impaneled, and the plea of not guilty put in issue all
material facts; and that is true, and we may consider
the proposition from that standpoint.

The fact that a juror has formed an opinion on one
or more facts of the case has never been held as a
sufficient ground of challenge. The Code (section 4405)
defines what shall be a sufficient challenge in this
respect in these words: "Having formed or expressed
such an opinion as to the guilt or innocence of the prisoner as would prevent him from rendering a true
verdict upon the evidence submitted on the trial." It
will be seen that, where an opinion has been formed,
it is a question of fact for the court whether or not it
is one that would prevent the juror from rendering a
true verdict upon the evidence. See *State v. Munch-
rath*, 78 Iowa, 268 (43 N. W. Rep. 211). In this case
no juror stated that he had formed an opinion as to
the guilt or innocence of the defendant. In the
*Munchrath Case* several jurors said that they had read
such evidence in the papers as that they had formed
an opinion in regard to the guilt or innocence of the
defendant; that they had talked about the case; and
that it would require evidence to remove the opinions
formed. The court in that case denied a challenge for
cause, and the ruling was sustained. The facts showing prejudice in that case were far stronger than in this.
It is held that in that case and in the other cases cited

therein that "a person may form an opinion from read-
ing newspaper accounts of crime, and from hearing
others speak of it, and not be disqualified thereby from
acting as a juror, provided the opinion so formed is
not of such a character as to interfere with the render-
ing of a true verdict, on the evidence submitted on
the trial." The court in this case determined, upon
evidence submitted, that the jurors were competent,
and there is no ground for our disturbing that finding.

V.   A Mr. Lucket was a witness, and described a
hat that Hamil wore on the night of the homicide. The
following, from the record, will indicate the question
next to be considered as briefly as otherwise:
"Mr. Haskins:   Before going further with this
case, the defendant requests the presence of
the codefendant Hamil in the courtroom, he now being
in jail; and, the evidence being especially relative to
the defendant Hamil, defendant's counsel requests his
presence here for the purpose of consultation.   By the
Court:   The request will be denied.   On yesterday,
the accused, Hamil, was permitted to remain in court
at the request of the counsel of this defendant, Weems,
who is now on trial; and upon retiring from the room,
the officers of this court, as a matter of precaution and
safety, searched the accused, Hamil, and found on his
person a bottle of alcoholic liquor, being secreted into
the jail. · For this and other reasons, this request is
denied.   (The defendant Weems excepts.)   Mr. Haskins:
The defendant in this case takes exception to the state-
ment of the court with reference to the conduct of
the codefendant Hamil yesterday, and takes exception
to the statement of finding of the alcoholic liquors, or
anything else on the said Hamil's person, as being
prejudicial to the rights of this defendant, and being
improper, and no matter which should go before this
jury, nor should it be mentioned in the presence of
this jury.   Court:   Counsel for the defendant, earlier

in the proceedings this morning, suggested that he
would like the presence of Hamil, and it was suggested
to him that he could not be permitted to be present
until he was needed, and gave him the reasons; and,
when I denied his presence, the counsel suggested
that he wanted it in the record, and I then suggested
to counsel the whole record would have to be made."
It then appears, from statements of counsel, that he
desired him for particular and special reasons.
It will be seen that the only right denied was
that of having Hamil continuously in court
during the examination of the witness. There was
no denial of the right to have him brought in when
needed for such a purpose. In fact that right was
offered. The defendant had no legal right to claim
the presence of Hamil in court for consultation, only
in case he should desire to consult him. The record
is silent as to their being a time when consultation
was desired. The controversy seems to have been over
the right of defendant to have him there, ready for
consultation, instead of calling him if needed. It was
a matter within the discretion of the court.

Exception is taken to the remarks of the court as
to the whisky Hamil had in his pocket the day before,
and it is said that was not a sufficient reason for
denying his presence. It does appear that that was
one reason why he was excluded, and there were
others which seem to have been given counsel, but
they do not appear in the record. Even though we
might say that the fact as to the whisky was not a
sufficient reason to deny what would otherwise be a
legal right, we cannot say but that other rea-
sons were sufficient. We cannot assume that
they were not. That the reference to the whisky
was prejudicial to defendant is a mere assumption.
No reasonable person would have permitted an act of
Hamil to affect the defendant, on trial, for an act

which it could be seen he was in no way responsible for.

VI.  One Mary Thomas was a witness for the state.  Her name was Mary Temple when she was before the grand jury, and her name thus appears on the indictment.  She testifies to having seen the three men at Jeannette Allen's on the night of the homicide. This was the only point as to which she gave evidence.  On cross-examination she was asked many questions, such as: "What was the character of Jeannette Allen's house?"  If it was not a sporting house.  If she was not an inmate,—not a prostitute.  If she had not been in court within a year, under the name of Hirshman, and prosecuted others under that name.  These questions were all excluded, and the rulings are said to be in error.  The extent of such inquiries, on cross-examination, is largely discretionary with the court.  Such an examination often tends to show the value of the testimony given, and is, within proper limits, cross-examination.  *State v. Row*, 81 Iowa, 138 (46 N. W. Rep. 872).  Even if the questions were proper there is not prejudice from the rulings.  Their only purpose would have been to test the value of her direct testimony, and that was as to the single fact that the men were at Jeanette Allen's on the night of the homicide.  That fact is not to be questioned in the case.  Even the defendant, in his confession made three days after the killing, says they were there, and that he played on the piano.  Still further, it may be said that, after the absolute disclosures that Hamil and Weems were the persons who met Ridpath when he was killed, the fact as to their having been at Jeannette Allen's became immaterial. It was only important at first in tracing the identity of the men.

VII.  John Kraut was a witness for the state, and, against objections, he was permitted to testify

that, when the three were at Mrs. Whitcomb's on the east side of the river, before going to the west side, there was a black-handled revolver in the room, and the revolver was described. This is said to be error, because the revolver is not shown to be connected with the case. It was not error. The mere fact that there was an attempt to identify that as the pistol used, and the attempt failed, does not render the evidence used on the attempt immaterial, so as to make the admission of it error. It is often the case that much of the testimony admitted becomes useless before the conclusion of the trial, but it is not for that reason error to admit it. That fact is noticeably true of this case. The same may be said as to other questions asked of Kraut, and admitted.

One other question we notice. On cross-examination defendant's counsel sought to show that he was giving his testimony with the hope of benefiting himself and escaping criminal prosecution, and the following appears in the record: "Q. Did not your attorney tell you this, that you had better testify to enough to let you out of it, and it would go easier with you? (Objected to as incompetent, irrelevant, and improper, and asking for advice of counsel. Sustained, and defendant excepts.) Q. And is not the idea in your mind, coming on the stand here now, that it is going to benefit you to tell that stuff? (Same objection. Sustained, and defendant excepts.)" No question is made as to the refusal of the first question, but it is urged that it was error to exclude the last. In the sense in which the question is taken in argument, the exclusion would have been error, because the jury had a right to know with what motive he gave his testimony. It went to his credibility. But the question, as asked, was incompetent and improper for more than one reason. The second question, by the use of the word "and," couples it to the first question,.

so that the answer to the one is an answer to both
when the former had been excluded.  A question thus
framed might well be excluded as incompetent,
because of its likelihood to induce an answer to one
part of it not intended. Witnesses are often unguarded
in such cases.  Had the witness said "Yes" to the last
question, it would have been the same answer to the
first question.  As counsel for appellant does not seem
to think the questions are united there is good reason
to think the witness might make the same mistake.
But the question is faulty in another respect.  By the
use of the word "stuff," it characterizes the testimony
as such.  "Stuff," defined, means "trash; nonsense;
foolish or irrational language."  Its evident meaning
in the question is "falsehood."  Had the witness said
"Yes" to the question, intending to state his idea as
called for by the question, he would have also said,
inferentially, that what he had testified to was stuff.
It is hardly necessary to state that such a question is
incompetent.  Its likelihood to betray one into an
implied acknowledgment of a fact not intended is
enough to condemn it.

VIII.  Hamil was called as a witness for defend-
ant, and after stating that he was with Weems and
Kraut on the east side of the river, and started
for the west side, the following took place: "Mr.
Haskins:  The attorney for Mr. Hamil (before
proceeding further in this case; I may have possibly
been hasty) requests permission to take his client, Mr.
Hamil, and have a private consultation with him before
he goes ahead with the case.  Court:  Very well; stand
aside.  Mr. Davis:  I shall object to the defendant in
this case going with the other party.  (Objection sus-
tained, and defendant excepts.)  Court:  That will
not be allowed; he can talk with his client, but not
with this defendant.  Mr. Haskins:  The request is
made, on the part of this defendant's counsel, that he

be permitted now to retire and consult with Hamil and his attorney. Court: The request is denied, and defendant excepts." This action of the court is severely criticised, on the theory that the defendant has been denied the right to consult his witness before the examination, and that defendant's attorney was denied the right to examine the witness before he examined him on the trial. Neither of such rights was denied. The attorney for defendant in this court was not the attorney on the trial below, and this fact may have led to some misapprehension. The consultation was in the interest of Hamil, to determine the course he should take in his examination, as will be seen in the consideration of the next point in the case, and the result of the conclusion was his refusal to answer the questions. It does not appear what induced the objection to Weems going with Hamil and his attorney; but the objection, with the ruling, seems to have induced Mr. Haskins, as attorney for Weems, to request that Weems be permitted to retire, and "consult with Hamil and his attorney." There is not a word to indicate that the consultation was in the interest of Weems. The defense had put Hamil on the stand, and the examination was interrupted by a request that his (Hamil's) attorney be permitted to consult with him; not that the defense wanted such a consultation. There is nothing of which the defense can complain.

IX. After the consultation between Hamil and his attorney he was recalled to the witness stand, and under advice of his attorney, Mr. Dyer, he declined to answer any of the questions asked of him, for the reason that the answers would tend to criminate him. Several questions were asked, and Mr. Dyer would present the objection, except that when the point was made that the privilege was personal to the witness, and he must exercise it, he would make the objection himself. The complaint is as to the interference by

Mr. Dyer, whereby the witness was interrupted, and, with the aid of counsel for the state, the witness was kept from answering. The record fairly warrants the belief that there was no division of sentiment, between the counsel for defendant and that of Hamil, as to the method of procedure. Counsel for Weems asked the questions which Hamil declined to answer, and saw all that took place, without a word of dissent or disapproval. The request for consultation, leading to the refusal to aswer, was made by him; and to the result, as disclosed, he took no exceptions, not even to the rulings of the court sustaining the refusals. The criticism upon the action of the court in this regard is without any foundation.

X.  Barney McBride was in the cell with Hamil and Weems when they were confined in the jail, and, as a witness for the state, said he had a talk with Hamil and Weems in the presence of one Sweetman, about the man who was killed on the railroad track, and Hamil said, in the presence of Weems: "If a railroad kills anybody, there is nothing thought of it, but, because we got the best of a railroad man, they want to drive us off the face of the earth." Sweetman was afterwards called for defendant, and, after stating that he was in the cell with McBride, Weems and Hamil, he said: "He never heard him talk to Weems and Hamil about the Ridpath murder, nor any talk with him. Neither of them withdrew and talked with him. Never heard any conversation between Weems and Hamil about the Ridpath murder." The witness was then asked: "Did you hear Hamil or Weems say to McBride this, in substance: 'The railroad company can kill a man, and nothing is said about it; but, now we got the best of railroad men, they want to run us off the earth,'—or something like that?" If 'this question had been so framed that an answer might have contradicted McBride, it would

certainly have been a proper exercise of discretion to
have admitted it, although the witness had already
stated the same thing by saying that he had heard no
talk on the subject between them.   However, it is
generally admissible to permit a question directly
expressing the particular facts to be contradicted, in
order to render certain the effect of the evidence.  But
in this case the question did not call for an answer
that could directly, even if it could by inference,
contradict Sweetman.   McBride's statement was:
"Because we got the best of a railroad man, they want
to drive us off the face of the earth."   The question to
Sweetman is:  "Because we got the best of railroad
men, they want to drive us off the face of the earth,'—
or something like that."   A negative answer would
have been a very uncertain meaning, both because
McBride's language, in the light of the record, referred
to Ridpath, while the question to Sweetman seems to
refer to railroad men generally, and, again, the
question ends with the words "or something like that,"
and the witness was left to say, in his mind, what
would be something like that.   While, in many cases,
such questions are used in practice, and may be allow-
able, what we say is that after a statement by a wit-
ness to the general effect desired, and a specific denial
of a fact is sought, the question should be such that
the answer, when given, if favorable, would amount to
such a denial.

One Williams was also in the cell at the time, and
he testified for defendant that Weems, Hamil, and
McBride had no talk about the Ridpath murder.  He
was then asked if the three, at any time, retired for a
secret conversation.   While the question might
have been admitted, there is no error in its
exclusion, for there was no such fact in evi-
dence to be contradicted.  Its purpose must have been

to guard the jury against assuming a fact without evidence, or dealing with such fact as a probability. No reason appears for disturbing the action of the court in this respect.

XI. The indictment is in the usual form, averring that the offense was committed with deliberation, premeditation, and malice aforethought, and without averments as to its having been committed in an attempt to perpetrate robbery. It is now contended that evidence that the killing was done in such an attempt is improper, because of the absence of such averments. It is not to be doubted that murder in the first degree, charged to have been committed deliberately, premeditatedly, and with malice aforethought, may be shown, even though, in committing the murder in the manner charged, the acts showing an intent to rob would be involved; that is, if a person, in an attempt to rob another, willfully, deliberately, etc., kills him, he may be convicted of a willful and deliberate murder, and, in doing so, the facts as to how he committed murder, including his attempt rob, may be shown. Now, conceding that the offense must be shown to have been committed in the manner charged, to warrant a conviction, there is no error in the respect suggested, for the court required by its instructions that, before there could be a conviction, the facts must be found as charged in the indictment; and the facts as to lying in wait and as to robbery, both of which are shown by the evidence, were but links in the chain of evidence to show the facts of malice, deliberation, and premeditation, as charged in the indictment. This conclusion is in harmony with, rather than against, the rule of *State v. Baldy,* 17 Iowa, 39; *State v. Potter,* 28 Iowa, 554; *State v. Brandt,* 41 Iowa, 593.

XII. The first part of the third instruction is as follows: "If two or more persons conspire or confed-

erate together to commit an unlawful act, and, in pursuit of such conspiracy and commission of such unlawful act, such persons, or either of them, aided and abetted by the other, takes the life of or kills a human being, such taking of life is murder." It is said that the language thus quoted states an erroneous rule of law. If it be conceded that it is legally inaccurate in the use of the words "an unlawful act," as contended, nevertheless the remainder of the instruction, which is only separated from the other by a semicolon, and gives the application of the rule to the facts of the case, fixes the unlawful act to be considered as robbery, and only permits a conviction on the finding of the facts as charged in the indictment in an attempt to perpetrate robbery. Thus considered, the instruction involves no error.

XIII. Some instructions asked by the defendant were refused. In so far as they involved correct rules, they are covered by those given by the court; not, however, in the same or even similar language, but the rules are included, and a right of conviction denied under the facts as given in the instructions asked.

XIV. The court gave the following instruction, of which complaint is made:. "Sixteenth. Under the statute of the state, the defendant had the right to testify in his own behalf, or not, as he might elect; and, if he declined to so testify, it shall not be considered against him; and in this case you are instructed that you must not give any thought to the fact that the defendant did not testify in his own behalf." It is said the court had no right to refer to the matter of the defendant's failure to testify. The claim is based on Code, section 3636, which provides that, where a defendant does not elect to become a witness, the fact shall not have weight against him on the trial, nor shall the attorney or attorneys for the state,

during the trial, refer to the fact that the defendant did not testify in his own behalf. That rule, in its letter or spirit, does not apply to the court. The instruction was in the interest of defendant, and was induced, likely, by an apprehension that the jury might of its own motion consider the fact that the defendant did not take the witness stand to testify and draw improper inferences therefrom. Certainly the instruction could have done no harm.

There are some few questions that we have not noticed directly, but all of which are controlled by the points decided. We have given the case, because of its great importance, involving human life, patient and careful attention. The facts, in the main, are not in doubt. They are practically confessed. The motives and purposes that induced the killing, or whether it was accidental, are all that can be said to be doubtful. The finding of the jury upon the question has ample support in the evidence. The judgment will stand *affirmed*.