[No. 1876]

# THE STATE OF NEVADA, RESPONDENT, *v.* PATRICK C. CASEY, APPELLANT.

1. INDICTMENT AND INFORMATION—MOTION TO QUASH—DISQUALIFICATION OF GRAND JURORS—HEARING ON AFFIDAVITS.

Where accused, in support of his motion to quash the indictment for nonresidence of a grand juror, presented an affidavit on information and belief averring that fact, he could not complain of the presentation by the state of an affidavit of the juror averring his residence and the disposition by the court of the motion on the affidavits, and accused, if desiring the presence of the grand juror, should have subpenaed him. or taken his testimony by deposition.

2. GRAND JURY—NUMBER OF JURORS.

Twelve qualified grand jurors are a legal body, and may return an indictment.

3. CRIMINAL LAW — CHANGE · OF VENUE — PREJUDICE AGAINST ACCUSED.

To require a change of venue under Comp. Laws, 4271, providing for a change of venue on the ground that a fair trial cannot be had in the county where the indictment is pending, it must appear that the prejudice against the accused is so great as to prevent a fair trial, and it is not sufficient merely to show that great prejudice exists against him.

4. CRIMINAL LAW — CHANGE OF VENUE — PREJUDICE AGAINST ACCUSED.

Where there was great feeling against accused in the town where the offense was committed, but that feeling did not permeate the entire county, which contained between four and five thousand possible jurors, and many of the jurors were drawn from portions of the county where the victim of accused was unknown, and where the crime was hardly known of or discussed, the refusal to grant a change of venue on the ground of the prejudice against accused was not erroneous.

5. CRIMINAL LAW—CHANGE OF VENUE—DISCRETION OF TRIAL COURT.

A motion for a change of venue is addressed to the sound discretion of the trial court, and where it is possible to secure an impartial jury the denial of the motion is within the court's discretion.

6. JURY—QUALIFICATIONS OF JURORS—EXAMINATION ON VOIR DIRE.

In determining the condition of a juror's mind as to his qualifications, all of his examination· on *voir dire* should be considered and doubts as to his qualification resolved in favor of accused.

7. JURY—QUALIFICATIONS—OPINION.

A challenge to a juror, who on *voir dire* testified that he entertained an opinion which he could lay aside without any evidence, and that he could determine the case according to the evidence and the instructions, and that he had not expressed

Points decided

any opinion, but that he had at the present time some belief on the guilt or innocence of the accused, based on what he had heard, was properly denied.

8. JURY—QUALIFICATIONS—PREJUDICE.

A challenge to a juror, who on *voir dire* admitted that he entertained a prejudice against the defense of hereditary insanity and acute alcholic insanity, and did not believe in their existence, but who stated that if legal insanity was shown by the evidence and the instructions he would give proper credit to the defense, was properly denied.

9. CRIMINAL LAW—INSANITY—DEFENSE—QUESTION FOR JURY.

Where a defense of insanity is interposed for accused, it becomes a matter of evidence, the admissibility of which must first be passed on by the court to determine the form of insanity, and it then becomes a question of law for the court whether the form of insanity attempted to be proved is a legal defense, and if recognized the defense must be submitted to the jury by proper instructions.

10. JURY—DISQUALIFICATION OF JURORS—ABSTRACT OPINION.

The existence of a mere abstract opinion of a juror, in which no element of malice or unnecessary prejudice enters, does not form a just ground for the rejection of the juror, though he admits that the defense of insanity, owing to its abuse, raises a feeling of hostility to accused, and where the evidence shows that, notwithstanding his feelings against the defense, the juror will be guided by the testimony, uninfluenced by any bias, he is competent.

11. JURY—IMPANELING JURORS—TRIERS—DEMAND.

It is not error to fail to appoint triers to determine a challenge for actual bias, where there has been no demand for the appointment of triers.

12. CRIMINAL LAW—HARMLESS ERROR—IMPANELING JURORS—TRIERS —DEMAND.

Where a juror, on *voir dire*, disclosed bias on the ground of hereditary insanity, but showed no bias to the legal defense of insanity, the refusal to appoint triers to determine his bias on the ground of hereditary insanity was not prejudicial.

13. CRIMINAL LAW—DEMONSTRATIVE EVIDENCE—ADMISSIBILITY.

Where accused shot decedent and resisted an immediate arrest by a citizen by stabbing him with a knife, and the defense relied on drunkenness and insanity, the court properly admitted the knife in evidence.

APPEAL from the District Court of the Seventh Judicial District of the State of Nevada, Esmeralda County; *Peter J. Somers,* Judge.

Patrick C. Casey was convicted of murder in the first degree, and he appeals. **Affirmed.**

The facts sufficiently appear in the opinion.

*M. A. Diskin* and *John F. Kunz*, for Appellant:

The admission of the *ex parte* affidavit of Frank W. Champion in opposition to defendant's motion to quash the indictment was (a) hearsay; (b) the defendant was deprived of the right to be confronted by the witness or party making the affidavit; (c) the testimony should have been taken by deposition instead of by affidavit in the defendant's absence.    (Comp. Laws, 3995; 2 Jones, Evidence, 302; *Baldwin* v. *Flagg*, 43 N. J. Law, 495; *Cooper* v. *Galbraith*, 24 N. J. Law, 219.)

The court erred in denying appellant's motion for a change of venue.    The motion for change of venue was based upon the affidavit of Patrick C. Casey, and the record of the examination of talesmen was made a part thereof on the renewal of the motion after the jury had been selected.    No counter-affidavits or any other showing of any kind was made in opposition thereto by the state.    An enraged feeling of bias and prejudice existed against the defendant, and a fair and impartial trial could not be had.    The abuse of discretion in refusing the motion was such that the appellate court will afford relief.    (*State* v. *McLane*, 15 Nev. 345; *State* v. *Williams*, 3 Nev. 409.)    The showing made by the defendant plainly stated a case in which it was impossible to obtain a fair trial, the facts alleged therefor being uncontradicted by the state, and the feeling prevailing being such as to overawe and intimidate even the jury selected.    (*State* v. *Dwyer*, 29 Nev. 421; *People* v. *Suesser*, 132 Cal. 631, 64 Pac. 1095; *State* v. *Spotted Hawk*, 55 Pac. 1027; *People* v. *Yoakum*, 53 Cal. 566; *State* v. *Hillman*, 85 Pac. 63; Cr. Pr. Act, sec. 306; Comp. Laws, 4271.)

The challenge to Talesmen Sands and Hicks, interposed by the defendant for implied bias, on the grounds of their having formed and expressed an unqualified opinion or belief as to the guilt or innocence of the defendant, should have been granted, the examination not affirmatively showing such opinion or expression to have been based solely on the reading of the homicide, and showing that from information otherwise obtained that they were

both biased and prejudiced against the defendant (*People* v. *Miller,* 125 Cal. 44, 57 Pac. 770; *People* v. *Wells,* 100 Cal. 227, 34 Pac. 718; *State* v. *Dwyer,* 29 Nev. 421; *State* v. *Roberts,* 27 Nev. 449; *People* v. *Regis,* 5 Cal. 347; *State* v. *Rutton,* 43 Pac. 30; *State* v. *Murphy,* 37 Pac. 420; *State* v. *Wilcox,* 39 Pac. 368; *State* v. *Otto,* 58 Pac. 995; *State* v. *Morrison,* 68 Pac. 48), and the record shows defendant was compelled to exercise one of his peremptory challenges on said Talesman Sands, and defendant exercised all of his peremptory challenges allowed by law, and the said Talesman Hicks still remained upon the jury selected to try the case, and defendant excepted to and objected to the jury as constituted before being sworn. (*Burch* v. *S. P. Co.,* 32 Nev. 75; Cr. Pr. Act, 340; Comp. Laws, 4305; *State* v. *Brown,* 70 Ind. 576; *People* v. *Casey,* 96 N. Y. 115, 123; *Fletcher* v. *Christ,* 38 N. E. 473; Cr. Pr. Act, sec. 340; Comp. Laws, 4305, subd. 8.)

The challenge for actual bias to Sands should have been sustained, he having in his examination shown a state of mind whereby he could not act with impartiality toward the defendant, the challenging party, and the defendant was compelled to exercise one of his peremptory challenges against said talesman and having used all of his peremptory challenges allowed by law. (Cr. Pr. Act, 339, 344; Comp. Laws, 4304, 4309.)

The court should have appointed triers as required by the statute to determine the challenge for actual bias interposed by defendant against Talesman Sands, the defendant having requested such triers to be appointed. (Cr. Pr. Act 344, 345; Comp. Laws, 4309, 4310; *State* v. *Raymond,* 11 Nev. 98.)

The admission of the testimony set forth in exception 9 of the bill of exceptions was prejudicial error, being a fatal variance in the indictment and proof, tending to prejudice the minds of the jury, and irrelevant, immaterial and incompetent. (*Terr.* v. *Rowand,* 19 Pac. 595; *People* v. *Lane,* 34 Pac. 856.)

The court erred in permitting the state to read a portion of the testimony given by Witness McIntosh at the

coroner's inquest, set forth in exception 10 of the bill of exceptions, as it tended to prejudice the minds of the jury, being improper testimony and improper redirect examination. (Underhill, Crim. Ev., sec. 223, p. 274.)

The author states the rule to be as follows: "The party calling the witness ought, on the examination in chief, to interrogate him on all material matters. No new questions can be put on redirect examination which are not connected in some way with the cross-examination. But the courts of original jurisdiction have varied this rule, and it remains for them to determine whether in any particular case the facts warrant a departure therefrom. This discretion the appellate court will not interfere with except in the case of its gross abuse, when manifest injustice would surely ensue." Citing *Sartorious* v. *State*, 24 Miss. 602, 609, and other authorities.

And the defendant respectfully submits that the verdict was contrary to the law and evidence, and assigns as the reason therefor that no express malice was shown for the homicide, and also that, at the time of the commission of the crime, the condition of defendant, due to intoxication, was such that he was mentally incapacitated to have and possess the elements of deliberation and premeditation necessary to constitute murder in the first degree.

The defendant respectfully submits that the judgment of the lower court should be reversed, and that he should be granted a new trial.

*R. C. Stoddard,* Attorney-General, and *L. B. Fowler,* Deputy Attorney-General, for Respondent.

By the Court, SWEENEY, C. J.:

The defendant, under the assumed name of Patrick C. Casey, was indicted by the grand jury of Esmeralda County, State of Nevada, for the crime of murder in the first degree, for wilfully, feloniously, and with malice aforethought inflicting a mortal wound on Mrs. Lucy Heslip with a loaded pistol, from which she died on the 16th day of August, 1909.

It appears from the record that on the 16th day of August, 1909, at about 7 o'clock in the evening, the defendant shot and killed Mrs. Lucy Heslip and wounded her companion, Mrs. Alice Mann, at Goldfield, Nevada, while these ladies, with another, were seated in front of the Heslip home.    It appears that on the evening of the tragedy the victim of the accused, Mrs. Lucy Heslip, and Mrs. Alice Mann and Miss Leury, while engaged in neighborly conversation, were panic stricken by the defendant, who, after coming up the street to the Heslip residence, stopped, pulled and leveled his gun, and fired a couple of shots, striking Mrs. Mann; and when Mrs. Heslip, in a half rising position, screamed "What do you mean?" the defendant instantly turned, faced Mrs. Heslip, leveled his gun, and fired a bullet into the head of the lady, causing her almost instantaneous death.    The defendant then turned out into the street and, pretending to place the gun to his head, fired the fourth shot, making a superficial wound in his own head.    The defendant then strolled leisurely down the street, his pistol openly in his hand, and when overtaken at Hall Street by Mr. Dunn, who at once disarmed him, the defendant drew a carving knife and struck Dunn in the shoulder.    When cries of "lynch him" were heard by the defendant, although feigning to be dead drunk, he had sufficient presence of mind to hastily request Officer Sullivan to protect him and hurry him to the jail, and to inquire of Officer Sullivan, before being arrested, "Are you an officer?"

The motive for the crime asserted by the prosecution was for revenge against Mrs. Mann for repudiating him, and against Mrs. Heslip for interfering with his desires. In support of the motive for the defendant's crime, and his preparation for a defense thereto, it appears that the defendant, four months before the commission of this murder, took up his residence in Goldfield and lived with one Jack Murray, who owned a cabin within a few feet of the home of Mrs. Alice Mann, one of the women shot on the night of this homicide.    That Mrs. Mann resided with her husband for at least two months during the

time the defendant resided with Murray, and that the ordinary neighborly and friendly courtesies existed between the four. When Mr. Mann, out of employment in Goldfield, left for San Francisco to secure employment, the defendant began to attempt to force his attentions on Mrs. Mann and to attempt to assume a too familiar friendly relation, until he progressed to the extent of insulting Mrs. Mann with improper proposals, which Mrs. Mann indignantly repelled and rebuked the defendant for his attentions, and gave all of her social time to visiting the Heslips. This action on the part of Mrs. Mann and her refusal to have anything to do with the defendant aroused his unwarranted jealousy, and it appears he became greatly incensed at the Heslips for entertaining and protecting Mrs. Mann, in the absence of her husband, against the attempted attentions of the defendant towards Mrs. Mann. Notwithstanding Mrs. Mann repulsed the attentions attempted to be forced on her by the defendant, the defendant seemed to believe himself privileged in his jealous rage to reprove her for keeping so much company with the Heslips, and he was apparently jealous of the time she spent away from her home in company with the Heslips, for whom the defendant acquired a deep hatred and anger for some two weeks prior to the tragedy.

Between 9 and 11 o'clock on the morning of the day of the homicide, the defendant, after borrowing $1.50 from Murray, told him he was going to get drunk. Between 4 and 6 o'clock of the same day, Murray met the defendant in the Turf Saloon and asked the defendant to have a drink. The defendant, who had apparently been drinking, but who was not very drunk, accepted Murray's invitation to have a drink, saying to Murray, "Jack, this will make nine that I have had." Whereupon Murray told him he had enough, and that he had better go to bed. The defendant replied, "No, I am going to get good and drunk." After attempting to borrow a gun from Hildebrandt, one of the proprietors of the saloon wherein the defendant and Murray had taken this drink, the defend-

ant asked Hildebrandt to loan him a gun, which Hilde-
brandt refused to do.   The defendant then entered into
a discussion with Hildebrandt and others on the subject
of the defense of insanity, saying, among other things, in
effect to Hildebrandt that "if a man shoots another and
then attempts suicide, that will be conclusive evidence of
insanity; that will be a conclusive defense of insanity for
the shooting."   That upon his failure to secure the gun
from Hildebrandt, the defendant went home and got
Murray's pistol, and immediately came down to the Hes-
lip home for the purpose of killing Mrs. Mann and the
Heslips, but succeeded only in part in carrying out his
preconceived murderous plan in the killing of Mrs. Heslip.

The defendant was tried on the 26th day of October,
1909, in the district court of the Seventh Judicial Dis-
trict, in Esmeralda County, Nevada, before a jury, found
guilty of murder in the first degree, and sentenced by
the court to be hanged by the neck until he be dead.   A
motion for a new trial was made and denied, and, from
the order denying the motion for a new trial, defendant
seeks relief in this court to avoid the execution of the
judgment.

(1) The defendant moved to quash the indictment upon
the ground that Frank Champion, who was a member of
the grand jury who found the indictment, was a nonresi-
dent of the state.   Both the defendant and his counsel,
prior to this attack upon the indictment on this ground,
waived in open court all challenges and objections they
had to the panel of the grand jury and to the qualifica-
tions of each individual juror thereof.   (See Transcript,
pages 6 and 7.)

Conceding, for the purpose of considering this assigned
error, that counsel for defendant could renew their attack
upon the grand jury when both defendant and his counsel
had previously waived all objections to the panel and to
each individual juror thereof, even then we can see no
merit in the motion to quash the indictment.   The attack
upon the grand jury was made by an affidavit on infor-
mation and belief, stating that F. W. Champion, one of

the grand jurors who brought in the indictment against the defendant, had moved from Nevada and became a resident of California. This affidavit was met by a counter-affidavit by the grand juror Champion, disputing the fact set forth in the affidavit of the defendant, and alleging that he was at all times during the time he was a grand juror and for three years prior thereto a resident of Goldfield, Nevada, and had never taken up his residence outside of the state, or had ever formed any intention of so changing his residence. The direct, personal counter-affidavit of Champion thoroughly covered the affidavit of the defendant, which was made upon information and belief.

The defendant was in no position to complain of the method of bringing this fact of residence to the attention of the court by affidavit, when the attack upon the grand juror was made by the defendant by affidavit upon information and belief. If the defendant desired the presence of the grand juror, he should have issued a subpena for him; or if he desired his testimony taken by deposition he should have made application therefor. No such action was taken by counsel for defendant, and it was too late for him to raise this objection at the time the case was about to go to trial. As was said in volume 1, Ency. of Evidence, page 736: "The principal service of an affidavit as evidence is to bring to the knowledge of the court facts not appearing by the record, when such facts are necessary to be shown as a basis for some *preliminary* or *interlocutory* action, or in proof of matters which are auxiliary to the trial of the cause."

The presentation of affidavits on the part of the state to overcome this affirmative affidavit attack of defendant to the qualifications of this certain grand juror was in pursuance of a long-established method in this state of presenting the matter to the court, and no application having been made for the personal presence of the grand juror, or for the purpose of taking his deposition, he was in no position to complain. The court had the question of fact at issue directly presented to it by affidavit and

was in position to pass upon the matter presented, and being satisfied that there was no merit in the attack, which was made just as the case was to go to trial, very properly overruled the motion to quash upon this ground.

(2) There is no merit in defendant's further motion to quash the indictment interposed upon the ground that no more than twelve grand jurors considered or voted on the indictment returned against the defendant. This court has recently had occasion to pass upon this point adversely to appellant's contention, and we have held that where twelve qualified grand jurors consider and vote upon an indictment that such a body of twelve grand jurors is a legal body, and can return a legal indictment. See *State* v. *Williams,* 31 Nev. 360; *State* v. *Weber,* 31 Nev. 390.

In the State of California, where the statute on the formation of grand juries and their powers is identical with our own on these matters, the supreme court of that state has likewise held that an indictment returned by twelve grand jurors who have considered and voted on an indictment is sufficient. (*People* v. *Roberts,* 6 Cal. 214; *People* v. *Hunter,* 54 Cal. 65.)

(3) Defendant assigns as error the ruling of the lower court, denying appellant's motion for a change of venue. This motion was made under section 306 of the criminal practice act (Cutting's Compiled Laws, 4271), which reads as follows: "A criminal action, prosecuted by indictment, may be removed from the court in which it is pending, on the application of the defendant or state, on the ground that a fair and impartial trial cannot be had in the county where the indictment is pending."

The Supreme Court of Nevada, in the case of *State* v. *Millain,* 3 Nev. 432, said: "There are few cases that present themselves to appellate courts where it is more difficult to determine upon any settled principles or rule of action than in these cases relating to a change of venue. By all it is admitted that there is a broad discretionary power allowed the court of original jurisdiction. But, whilst that court has such discretion, it is

still a judicial and not an arbitrary discretion. If that discretion is used in an arbitrary and oppressive manner, an appellate court is bound to correct the error, but to distinguish between what is and what is not an abuse of that discretion is often a very nice and difficult question. There are two circumstances, the existence of either of which should entitle the defendant to a change of venue. The one is the impossibility of obtaining an impartial jury. The other is such a state of public excitement against the defendant that even an impartial jury would be likely to be intimidated and overawed by public demonstrations against the accused."

Again, this court, in the case of *State* v. *McLane,* 15 Nev. 372, said: "On the whole we think the application in this case for a change of venue was not materially stronger than that in the case of Millain (3 Nev. 433), where the order overruling the motion was affirmed by this court. It is not shown in this case, any more than in that, that the parties threatening violence to the defendant were either numerous or influential; and we do not understand that the mere prevalence of a belief in the guilt of a prisoner, however widely diffused, is a circumstance from which it must be inferred that a jury would be intimidated or overawed."

Again, in the case of *State* v. *Gray,* 19 Nev. 215, this court said: "Defendant applied for a change of venue on the ground of prejudice existing against him in the county where the indictment was pending, which would prevent him from having a fair and impartial trial. The application was based upon affidavits tending to establish the fact alleged, and resisted by counter-affidavits. It is unnecessary to consider the contents of the affidavits. The district court overruled the motion for the time being until it could be shown by an examination of a sufficient number of jurors that a fair and impartial jury could not be obtained. After examining eighty-one persons, a jury was impaneled. The statute authorizing a change of venue in criminal cases provides that, before granting the order, the court shall be satisfied that the representations

of the moving party are true. The question whether a fair and impartial jury could be obtained depended largely upon the opinions of witnesses. Opinions differed widely, and the court adopted a very satisfactory test to ascertain the fact. The practice pursued was approved in *State* v. *Millain,* 3 Nev. 433, and by the Supreme Court of California, in *People* v. *Plummer,* 9 Cal. 299, and in *People* v. *Mahoney,* 18 Cal. 181."

In the case of *State* v. *Dwyer,* 29 Nev. 427, this court observed: "Outside of the fact that every case where a change of venue is sought must come within certain broad principles, each case must be determined upon its own particular facts."

It was represented on a motion for a change of venue that intense feeling of malice and indignation was aroused against the defendant in the community by reason of the commission of the crime for which he was indicted, and that the defendant had to be removed from the county of Esmeralda to the adjoining county for safety of his life, and to avoid violence at the hands of a crowd congregated for the purpose of lynching him. It is alleged that the feeling of bias and prejudice which existed against the defendant was such that defendant would be precluded from having a fair and impartial trial in the community in which this atrocious crime was committed, and that the court abused its discretion in not granting the motion for a change of venue. In support of this position, affidavits of the defendant and of M. A. Diskin, Esq., his attorney, were introduced.

The rule is well settled "that it is not sufficient merely to show that great prejudice exists against the accused. It must appear that the prejudice against him is so great as to prevent him from receiving a fair and impartial trial, and where evidence before the court is conflicting its decision will not be reversed upon appeal." (12 Cyc. 244, and cases cited.)

It appears from the evidence, in the county of Esmeralda where this crime was committed, there were between four and five thousand possible jurors, and that after an

examination of seventy-six talesmen a jury was obtained. The revolting character of the offense, for which defendant was indicted and convicted, is such that it is not strange that public sentiment should have been aroused against the accused.   In fact, it would be strange if any one hearing of the cowardly and unwarranted assault could entertain sentiment otherwise.   This fact in itself, however, is not sufficient to warrant a change of venue, unless it affirmatively appears that the defendant could not secure a fair and impartial trial before a fair and impartial jury.   An examination of the record discloses, however, that the prejudice was not such that the court was unable to secure twelve impartial jurors from a comparatively small proportion of the venire summoned within a very short time, to determine the guilt or innocence of the accused, and that while, generally speaking, there was great feeling against the defendant in the town of Goldfield, yet that feeling did not permeate the entire population of the large county from where many of the jurors were drawn, and where the victims of the defendant were unknown, and where the crime was hardly known of at all, or discussed or considered but little. Again, the trial court was in a better position to judge as to whether or not the prejudice aroused against the defendant by his act had not had time to be allayed, and public sentiment calmed to the extent of allowing the defendant a fair and impartial trial before a fair and impartial jury.

A motion for a change of venue is addressed to the sound discretion of the trial court, and where it appears from the showing made in support of or against the application that it is possible to secure a fair and impartial jury, and the trial court has not abused its discretion, the order denying the motion for a change of venue will be affirmed.   (*State* v. *Gray,* 19 Nev. 212; *State* v. *Millain,* 3 Nev. 409; *State* v. *McLane,* 15 Nev. 371; *People* v. *McCauley,* 1 Cal. 383; *People* v. *Goldenson,* 76 Cal. 328; *People* v. *Mahoney,* 18 Cal. 180; *People* v. *Congleton,* 44 Cal. 92; *Gitchell* v. *People,* 146 Ill. 175, 33 N. E. 757, 37

Am. St. Rep. 147; *Hickan* v. *People*, 137 Ill. 75, 27 N. E. 88; *State* v. *Williams*, 115 Iowa, 97, 88 N. W. 194; *State* v. *Edgerton*, 100 Iowa, 63, 69 N. W. 280; *State* v. *Weems*, 96 Iowa, 426, 65 N. W. 387; *State* v. *Daugherty*, 63 Kan. 476, 65 Pac. 695; *Dilger* v. *Commonwealth*, 88 Ky. 550, 11 S. W. 651; *People* v. *Sammis*, 3 Hun, 560; *State* v. *Russell*, 13 Mont. 164, 32 Pac. 854; *Goldsberry* v. *State*, 66 Neb. 312, 92 N. W. 906; *Pallis* v. *State*, 123 Ala. 12, 26 South. 339, 82 Am. St. Rep. 106; *Hawes* v. *State*, 88 Ala. 37, 7 South. 302; *Rains* v. *State*, 88 Ala. 91, 7 South. 315; *Territory* v. *Barth*, 2 Ariz. 319, 15 Pac. 673; 4 Am. & Eng. Ency. Pl. & Pr. 398.)

We have carefully examined the affidavits in support of the motion for a change of venue and find nothing therein which convinces us that the lower court abused its discretion in denying the motion for a change of venue.

(4) It is contended by the appellant that the challenges interposed by the defendant for implied bias to Talesmen Charles Sands and M. Hicks, on the ground that they had previously formed and expressed an unqualified opinion as to the guilt or innocence of the defendant, should have been allowed. We believe that a thorough examination of the record discloses that the jurymen Sands and Hicks, contrary to the contentions of appellant, did not testify on their *voir dire* examinations that they possessed and expressed unqualified opinions.

The law is well settled that in determining the condition of a juror's mind as to his qualifications to sit as a juror, all of his examination on his *voir dire* should be considered, and doubts as to this qualification should be resolved in favor of the accused, as in other matters, to the end that he may be tried by a fair and unbiased jury. (*State* v. *Buralli*, 27 Nev. 41; *State* v. *Williams*, 28 Nev. 409.) If trial courts will always keep in mind this rule and keep in check our young and overzealous district and other prosecuting attorneys, who, in their desire for a conviction, sometimes tread too close to the line of getting disqualified jurors rather than to giving the

accused his every right, fewer reversals for this common character of invasion of a defendant's rights will be necessitated and great cost to the county and state saved, and the public given less well-grounded cause for criticism for the law's delay.

In the record, in the examination of Sands, among others, the following questions and answers were given by the juryman Sands to questions put to him by the assistant district attorney, counsel for the defendant, and the court:

"Mr. Liechti—Q. The opinion that you now entertain, is it a fixed and firm opinion that would amount to a conviction? A. Well, no, sir; I can't say that.

"Q. Could you lay that opinion aside and give the defendant a fair trial? A. I think I could.

"Q. Then the opinion that you have at the present time amounts to nothing more than a suspicion. Is that correct? A. Well, you might call it that.

"Q. It would require the introduction of evidence in order to enable you to lay it aside, would it? A. Well, it would, to lay it aside, certainly.

"Q. If you were accepted as a juror, you could lay it aside to begin with, could you not? A. I think so, yes.

"Q. It would not require any evidence to enable you to do that, would it? A. No, sir.

"Mr. Liechti—We traverse the challenge.

"The Court—Q. You understand, of course, the difference between a qualified opinion and an unqualified opinion? Did you ever express or did you ever entertain an unqualified opinion as to the guilt or innocence of the defendant? Or, to make it plainer, did your opinion depend on other things which might be true or might not? A. Well, what I know is certainly true. What I have learned—what I know.

"Q. Did you see any of the transaction complained of? A. No, sir.

"Q. Have you, or did you ever have, or did you ever express, an unqualified opinion as to the guilt or innocence of the accused? A. I don't think I did.

"Q. Now, you understand the difference between a

qualified and an unqualified opinion, and you think you never expressed or entertained an unqualified opinion as to his guilt or innocence?   A. I don't think I did, Judge.

"Mr. Kunz—Q. You say that you have talked to parties pertaining to this matter?   A. Why, I heard a whole lot of it, you know; talked some about the matter.   For two weeks you didn't hear anything else.

"Q. You heard people express their opinions as to whether he was guilty or innocent?   A. Yes, sir.

"Q. When you heard these remarks made by other parties, did you weigh them in your own mind in any manner whatsoever?   A. Well, I don't know that I paid any attention to it.

"Q. Did you weigh them sufficiently to form a belief as to his guilt or innocence in your own mind?   A. To some extent.

"Q. Have you a belief at the present time as to whether the defendant is guilty or innocent?   A. I have.

"Q. Have you ever expressed that belief?   A. I don't recollect that I did.

"Mr. Kunz—I submit he is an incompetent juror under that section, the eighth ground, of section 340 of the criminal practice act, where *belief* is specified.

"The Court—In the Dwyer case the supreme court has held that if a man has an unqualified belief, or has expressed an unqualified opinion, he ought to be dismissed.   I have asked this juror as to his opinion, whether qualified or unqualified.   He says he has not an unqualified opinion, and that he has never expressed such an opinion.   I think the word 'unqualified' refers to opinion as much as to belief.   Belief does not stand alone in the statute, in my opinion, but is qualified by the word 'unqualified.'   I think the juror is competent."   (Transcript, pages 245, 246, 247, and 248.)

The following is a part of the examination of Juror Hicks:

"The District Attorney—Q. What do you understand to be a qualified opinion, or an unqualified opinion?   A. I don't know that I said I had formed an unqualified opinion.

"Q. Assuming that you did say that, do you wish to

change that answer now? A. I don't see where I would have any right to form such an opinion; I haven't heard any of the witnesses or testimony.

"Q. Have you, from newspaper reading or hearing people talk about the case, formed an opinion as to the guilt or innocence of the defendant? A. I have, to a certain extent; but as far as prejudice is concerned against anyone I have none.

"Q. Is it a qualified or an unqualified opinion? A. I guess you would call it a qualified opinion. * * * (Transcript, page 285.)

"The Court—Q. Is it your opinion that you could give the defendant a fair trial and an impartial trial, or that in your state of mind you could not do so? A. I would give anyone a fair trial.

"Q. We are only talking of one now. Could you give the defendant a fair and impartial trial? A. Yes, sir.

"Q. This is the only case under consideration. Do you say you have or have not an unqualified opinion as to his guilt or innocence? A. I have not.

"Q. Have you ever expressed an unqualified opinion as to his guilt or innocence? A. Not that I can remember." (Transcript, page 287.)

The challenges to the jurors Sands and Hicks interposed by the defendant, upon the ground that they had formed and expressed unqualified opinions, we do not believe well taken, and the court, we think, very properly denied the challenges.

(5) The defendant next assigns as error the ruling of the trial court denying his further challenge to the juror Sands, because of answers given by said juror in regard to insanity superinduced by the excessive use of alcohol, and on the phase of hereditary insanity. The juror on his *voir dire*, in answer to the essential interrogatories propounded to him by counsel for the defense, the district attorney, and the court bearing upon this issue, were as follows:

"Mr. Kunz—Q. If the defendant should interpose a defense of insanity, do you entertain any prejudice or

bias against such a defense? A. I never paid much attention to it. I couldn't say.

"Q. Have you any bias or prejudice against such a defense? A. To some extent I have.

"Q. To what extent? A. Well, I couldn't say to what extent.

"Q. Do you believe in hereditary insanity? A. No, sir.

"Q. Do you believe in acute alcoholic insanity? A. No, sir.

"Q. Do you believe in any form of insanity? A. I do.

"Q. What form? A. If a man is insane.

"Q. If it should be shown by competent evidence that the defendant at the time of the commission of this crime did not know what had taken place, would you give credit to such a defense? A. Well, I guess I could.

"Q. Would you have any prejudice against that kind of a defense? A. No; I don't hardly think so.

"Q. Have you any prejudice against acute alcoholic insanity superinduced by intoxication? A. I have.

"Q. Would you give credit to such a defense? A. No, sir. * * *

"Mr. Liechti—Q. When you state that you have a prejudice against any particular form of insanity, do you mean to say you would look at the evidence tending to show that state of mind with caution? A. That was not the way this gentleman placed it.

"Q. But is that what you mean? A. How is that, again?

"Q. The question as put by counsel was whether you had any prejudice against any particular form of insanity as a defense to crime. Is it your idea that if a defense of that kind were offered, you would scrutinize it with caution? A. The gentleman placed it alcoholic insanity.

"Q. With respect to that: If it were shown in this case, or any case, that an absolute state of insanity existed in an individual during the time that he is charged with having committed a certain crime, and that state of insanity was superinduced by alcohol, would you not, under the instructions of the court, if

they were in that direction, accept that as a defense? A. I would certainly pay attention to the instructions of the court.

"Q. And if you were convinced that the individual was insane, notwithstanding the fact that his insanity was superinduced by alcohol, would you then acquit him? Let me ask that again, if you don't understand it. If you were convinced in a case where the plea is insanity that the individual was insane at the time he committed the act, and that insanity was superinduced by alcohol, and the court instructed you that it didn't make any difference what the cause of insanity was, and you were convinced that he was insane, would you acquit him? A. I would go entirely by the evidence and the instructions of the court.

"Q. And if you were convinced that he was insane, you would acquit him, would you not? A. Well, I expect I would have to.

"The Court—Q. If a man is insane, and wholly irresponsible, doesn't know the difference between right and wrong, or has no will power, no matter what that condition of mind is caused by, would you find him guilty of an act of this character? A. No; I don't think so.

"Q. If he was devoid of will power, brought about by any agency, at the time the act was committed, would you hold him responsible for his act? A. Well, this is pretty hard, Judge. If it is brought on by alcohol, I don't know what I would do in that case.

"Q. Would you follow the instructions of the court as to your duty in that regard? A. I would.

"Q. Do you mean that you simply would scrutinize more closely, or that you would scrutinize closely, the cause of the insanity in case it was alleged to have been brought about by alcohol? A. Yes, sir.

"Q. But if you found that a man was wholly irresponsible on account of alcohol, would you find him guilty, if he was wholly irresponsible on account of that? A. On account of alcohol?

"Q. Yes.  A.  I would, unless the court instructed otherwise.

"Q. Suppose the court should instruct you that a man could not be found guilty of a crime, if he was irresponsible from any cause?  A.  I would take the instructions.

"The Court—I think the juror is qualified."

The examination discloses that the juror would give proper weight to any proper defense of insanity which the instructions of the court might have required him to give.  It is evident from an examination of the *voir dire* of Juror Sands that, while to a certain extent prejudiced against crime committed by those who may thereafter attempt to prove hereditary insanity, or insanity by reason of an unbalanced mind superinduced by liquor, or commonly referred to as acute alcoholic insanity, yet, if it were shown by competent evidence that the defendant, at the time of the commission of the crime, was legally insane under the evidence adduced and the instructions of the court, the juror under consideration would give proper credit to such a defense.

Counsel for the defense seem to fail to grasp the distinction and understand the difference between insanity as a defense, and the forms of insanity which are first matters of evidence to be offered and proved; and that if a defense of insanity is interposed by counsel for defendant to excuse his act and relieve him of criminal responsibility, it becomes a matter of evidence, the admissibility of which has first to be passed upon by the court, to determine the form or character of insanity; and whether the form or character of insanity be hereditary or superinduced by the excessive use of alcohol, or otherwise, it then becomes a question of law to be determined by the court as to whether or not the form or character of insanity attempted to be proved is recognized as a legal defense, and if recognized or not to be covered by proper instructions covering the limitations under which it may be considered by the jury.

The Supreme Court of Pennsylvania, in the case of *Laros*

v. *Commonwealth,* 84 Pa. 200, very properly observed: "A court is not bound to hear evidence of the insanity of a man's relatives (or other collateral or secondary evidence) as grounds of a presumption of possible insanity, until some evidence has been given that the prisoner himself has shown signs of his own insanity."

In Rice on Evidence (Criminal), volume 3, that learned author tersely states the rule which should govern courts regarding the allowance or rejection of a challenge to a juror where he admits some prejudice in the abstract against an accused who sets up a plea of insanity as a defense for crime, which is as follows: "The existence of a mere abstract opinion, in which no element of malice or unnecessary prejudice enters, can certainly form no just ground for the rejection of a juror, even where he admits that the defense of insanity, owing to its gross abuse, would raise some feeling of hostility to the accused. If the evidence shows that, notwithstanding this feeling against this defense, the juror can still be guided to his verdict by the testimony in the case, uninfluenced by any feeling of bias, he is competent as a juror."

Reviewing the whole record, we are of the opinion that the challenge for actual bias interposed against the juror Sands, because of his opinion regarding acute alcoholic insanity as a defense, was not substantially taken, and that the court did not err in denying the challenge. Neither was there any error committed by the trial court in refusing to allow the challenge to Juror Sands, because said juror stated he did not believe in hereditary insanity, for the reason that counsel for the defendant did not properly lay a foundation to impeach the juror's testimony by bringing his questions within the rule above stated as to when proof of hereditary insanity may first become admissible. Juror Sands was afterwards peremptorily challenged by the defendant and did not serve on the jury.

We do not believe the court erred in failing to appoint triers to determine the challenge for actual bias interposed by the defendant against Talesman Charles Sands for the following reasons: In the first place, it does not

appear anywhere in the record that defendant ever requested or demanded of the court to appoint triers, and in consequence there is no valid exception before us. The only remark made by counsel relative to triers was, "We think it should be put up to triers." What counsel "think" cannot be construed as a demand.

"It is error for the court to refuse to appoint triers in any case where they may be demanded, and such demand is properly made." (Cyc., vol. 24, p. 348, and authorities cited.)

"The usual mode of disposing of challenges for favor is by triers, though doubtless the judge may hear and determine the matter *in case triers are not demanded.* Regarding, therefore, the challenge in this case as to favor, and the judge acting in the place of triers, we must consider his determination precisely as we would that of triers duly appointed, and hence conclusive." (*Shoeffler* v. *State*, 3 Wis. 830.)

"The law allows triers for the benefit of the prisoner, or the people. Either may waive it. '*Quilibet protest renunciare pro se introducto,*' is a maxim of universal application. The prisoner may even waive his right to a trial, at the hands of a jury, of the merits by pleading guilty. Having this power, no one will pretend that he cannot consent to anything else. He may *waive* any matter of form or substance, excepting only what may relate to the jurisdiction of the court." (*People* v. *Rathbun*, 21 Wend. 542.)

Assuming that a proper demand was made, which the record discloses to the contrary, the examination of the juror Sands discloses, up to the point where counsel claim that triers should have been appointed to determine his actual bias on the ground of hereditary insanity, the testimony of the juror on his *voir dire* discloses that he had no actual bias to the legal defense of insanity, but an abstract prejudice against the form of hereditary insanity, which matter we have above discussed and disposed of. The law allowing triers to be appointed by the court is seriously attacked as unconstitutional by counsel for respondent,

as an unwarranted usurpation of the legislative branch of the government on the vested constitutional rights and powers of the judiciary, and because the appointment of triers assumes a delegation of judicial authority which the judiciary cannot, under the constitution, delegate to others. It is unnecessary to pass upon the constitutionality of this law, for the reasons we have heretofore advanced showing no error in the ruling of the court by reason of its failure to appoint triers to determine the testimony of the juror under consideration.

The court did not err in admitting state's Exhibit No. 1, a knife, over the objection of the defendant. It is maintained the knife did not tend to prove any of the facts at issue in the case, for the reason that the indictment set forth that the assault on Mrs. Heslip was perpetrated by a gun, and not a knife, and because it tended to prejudice the jury.

It is claimed by the defendant, in extenuation of his crime, that he was so drunk or insane he did not know what he did. Prior to the introduction of this exhibit, there was testimony by the state showing that the defendant had a motive in the commission of the crime for which he was indicted; that he had illicit designs on Mrs. Mann; that these designs the Heslips gave their aid to frustrate, and in so doing aroused and incited the defendant to hatred against them. It was shown that, notwithstanding the defendant claimed to be drunk or insane and knew not what he did, that he resisted arrest by one Dunn by stabbing said Dunn in the shoulder with a knife, and resisted until overpowered and disarmed, but freely gave himself up to arrest when he was in the arms of an officer on whom he could rely for protection and seek his aid, in hurrying him to the jail, against the mob, who were yelling, "Lynch him!" The exhibit was properly admitted in support of the contention of the state in opposition to the assumed defense of insanity which defendant was interposing, and was beyond any question of a doubt admissible.

A careful review of the entire record convinces us that

the cause was carefully tried and the rights of the accused jealously and well guarded, and that he was accorded a fair and impartial trial. The record shows no prejudicial error to have been committed. The judgment of the lower court sentencing the defendant to be hanged by his neck until he be dead, and the order denying the motion for a new trial, will therefore be affirmed.

The district court is herewith ordered to fix a time wherein the judgment of death, heretofore pronounced against the defendant, for the murder he wilfully committed and for which he was regularly convicted, be carried into execution by the warden of the Nevada State Prison, as provided by law.

It is so ordered.